AUGUSTUS E. STALEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EMMA L. STALEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 88772, 88773. Promulgated April 5, 1940.

*C. C. Le Forgee, Esq., George F. Brewer, C. P. A.,* and *H. A. Mihills, C. P. A.,* for the petitioners.

*F. F. Korell, Esq.,* and *Francis T. Donahoe, Esq.,* for the respondent.

DISNEY: These proceedings were consolidated for hearing and report, and involve the redetermination of deficiencies in gift taxes for the year 1934, the amount being $456,277.50 in Docket No. 88772 and $27,793.98 in Docket No. 88773. The issues common to both proceedings are whether completed gifts were made in the taxable year and, if so, the value of the stocks involved in the gifts. The findings of fact upon each issue will be followed by the opinion thereon.

### FINDINGS OF FACT UPON FIRST ISSUE.

The petitioners are residents of Decatur, Illinois. Prior to 1927 Augustus E. Staley, the petitioner in Docket No. 88772, hereinafter sometimes referred to as the petitioner, frequently discussed with his wife, the petitioner in Docket No. 88773, the question of giving to each of their five children shares of stock in the A. E. Staley Manufacturing Co., hereinafter referred to as the company. At a family gathering in 1927, attended by about all of the children, the petitioner informed the children present that he expected to distribute some of his holdings of stock of the company among his children. No transfers were made at that time because of marital difficulties existing between several of the children and their respective spouses. These difficulties were not adjusted until the early part of 1934.

On October 18, 1934, the petitioner executed an instrument transferring to the Safe Deposit & Trust Co. of Baltimore, in trust, for the benefit of his daughter, Ione Tresslar Dunlap, 6,000 shares of common stock and 2,000 shares of preferred stock of the company, with no reservation of a right to revoke. The instrument provided that, after payment of the expenses of the trust, $30,000 of the income received by the trustee prior to March 15, 1935, should be paid to the petitioner in satisfaction of a recited consideration of a like amount for transfer of the property. This provision was inserted in the instrument for the purpose of providing the petitioner with cash to pay part of the gift tax on the transfer. A like instrument was executed by the petitioner on the same day for each of his other four children. Each block of stock was evidenced by one certificate issued to the trustee. All of the five children of petitioners were of legal age in 1934.

In a gift tax return for 1934 the petitioner reported gifts totaling 10,000 shares of preferred stock and 30,000 shares of common stock of the company under trusts executed for the benefit of his children, and in addition thereto a gift, through his wife, of 2,000 shares of preferred stock and 1,000 shares of common stock of the company to the Safe Deposit & Trust Co. of Baltimore, to be placed in trust for the benefit of his wife for life, with remainders over to his children. The petitioner deducted from the value of each gift to his children the sum of $30,000 as consideration paid.

In 1933 the petitioner transferred to his wife 5,000 shares of preferred stock of the company, with the verbal understanding that she would transfer it in trust for the benefit of their children, reserving to herself a life interest in the income thereof, at or about the time he made transfers of a similar nature. The transaction was reported in a gift tax return filed by the petitioner for 1933.

On or about October 19, 1934, the petitioner decided that his wife should have more life income from stock of the company. On October 19, 1934, he gave to his wife 2,000 shares of preferred stock and 1,000 shares of common stock, subject to the same understanding and conditions as the gift of 5,000 shares of preferred stock in 1933. To carry out the transaction the petitioner transferred to the Safe Deposit & Trust Co. of Baltimore certificates for the shares of stock involved in the gift. At or about the same time petitioner Emma L. Staley made a like transfer of certificates for the 5,000 shares of preferred stock which she had received from her husband in 1933. On October 19, 1934, the company reissued the stock in favor of the "Safe Deposit & Trust Company of Baltimore, trustee, under deed of trust from Emma L. Staley dated October 19, 1934", issuing one certificate for each class of stock.

On October 19, 1934, petitioner's wife executed an instrument transferring to the Safe Deposit & Trust Co. of Baltimore, in trust, 7,000 shares of preferred stock and 1,000 shares of common stock of the company, with directions, in general, to pay the net income therefrom to the trustor for life and then to her children for 20 years, when the trust was to terminate and the corpus was to be distributed to the children or their heirs. She did not reserve a power to revoke the trust. The stock was evidenced by the certificates referred to in the preceding paragraph.

On February 26, 1935, counsel for the petitioner submitted the following statement of facts to the collector of internal revenue for a ruling:

"A" is possessed of certain property. He makes a gift of approximately 60% of his holdings to his wife and children. As one transaction, he conveyed a part of this property to a trustee to be held for the use and benefit of his children. A part of this property consisted of bonds and stocks. These he assigned to his wife upon the 18th instant with the understanding that in pursuance of his plan of distribution she would, as to the bonds and stocks so assigned, create a trust identical with the ones he had created for the children, with the exception that the wife reserved a part of the income during the term of her life, at the termination of which it went to "A's" children. Upon the same day that "A" so assigned the stock in blank, the trust was executed by the wife, and the stock was never really in her possession except for the purpose of passing it over to the trustee. The creation of the deed of trust by the wife was purely in pursuance and a part of the scheme of "A" the original donor, the entire transaction involving a continuous method of the disposition of the estate as a part of "A's" scheme for making his gifts, *upon all of which he paid the gift tax.*

Query. Would the wife be compelled to pay an additional tax in the execution of the trust instrument to the trustee by which she carried the donor's intention into effect?

On March 12, 1935, the collector informed counsel of the receipt of a letter from the Commissioner on the subject, reading as follows:

In reply you are advised that if the securities were transferred to the wife in consideration of her setting up the trust referred to, the only gift would be the gift from the husband to the trustee.

All the facts, however, should be set forth in the donor's return.

In a gift tax return for 1934, Emma L. Staley included the 5,000 shares of preferred stock received from petitioner in 1933 at a value of $69,185.25, based upon a value of $76 per share and a life expectancy of 18.92 years, and the 2,000 shares of preferred stock and 1,000 shares of common stock at no value, with the following statement: "This transfer completes gift by A. E. Staley, returned by him for the year 1934 and gift tax paid by him as evidenced by his return."

In his determination of the deficiency against Emma L. Staley, the respondent included all of the stock in her return at a value of $100 per share, and arrived at a present worth of $469,808 for the gift by using the factor .58726 and 59 years as the age of the donor.

OPINION.

I.—The petition filed by Augustus E. Staley merely alleges that there is "grave doubt" whether the 30,000 shares of preferred stock and 10,000 shares of common stock were subject to gift tax after the passage of a gift tax law. He now claims upon brief that the gifts were made in 1927.

To establish a gift *inter vivos* there must be an intention on the part of the donor to give, an acceptance by the donee, and a transfer of title in the donee accompanied by relinquishment of dominion over the property by delivery to the donee. *Edson* v. *Lucas*, 40 Fed. (2d) 398.

It is clear from the evidence that for many years the petitioner entertained an intention to make a gift of some of his stock of the company to his children. He and his wife first discussed the subject in about 1922 and in 1927 he announced his desire at a family gathering attended by some of his children. It does not appear that his desire was communicated to the other children in 1927, and, aside from the testimony that his announcement produced "great rejoicing," there is no evidence to establish acceptance of gifts by any of the donees in 1927 or at any time thereafter prior to October 1934. Neither does it appear that at any time in 1927 the petitioner determined the number of shares of stock to give to his children. Martial difficulties existing at that time made it inadvisable to complete the gifts. The statement made by the petitioner in 1927 to some of his children amounts to nothing more than an announcement of his expectation to make a gift to them in the future.

The marital difficulties were settled in the early part of 1934 and at some undisclosed time thereafter in that year the petitioner arranged for the preparation of the trusts which he executed on October 18, 1934. Until that event occurred the petitioner was the record owner of the stock, retained the certificates in his possession, received dividends on the stock, and included the amounts thereof in his individual income tax returns. That he had no intention to relinquish title to or dominion and control over the stock prior thereto is definitely established by his testimony on cross-examination to the effect that he considered himself to be the unqualified owner of the stock until it was transferred by the trust instruments. This is inconsistent with an intention to make a gift of the property prior to that time. The petitioner's gift to his wife in 1933 was made subject to the provision that she transfer the stock in trust when he executed trusts in favor of his children. The trusts contemplated by the petitioner at that time are the ones involved herein. The conditions attached to petitioner's gift to his wife are consistent with a gift to his

children in the future and opposed to a prior gift. Gifts are not "consummate until put beyond recall." Burnet v. Guggenheim, 288 U. S. 280. The stocks in question were not placed beyond petitioner's recall until delivered pursuant to the trust instruments, and it was not until then that taxable gifts were made. J. D. Varnell, 28 B. T. A. 231.

The respondent committed no error in holding that the gifts involved in the five trusts executed by the petitioner on October 18, 1934, were made in 1934.

II.—The transfers involved in the trust created by Emma L. Staley consisted of 7,000 shares of preferred stock and 1,000 shares of common stock, 5,000 shares of the preferred having been received by transfer from her husband in 1933, and the remaining 2,000 shares, together with the common stock, on October 19, 1934. The petitioner reported the 5,000 shares in a gift tax return filed for 1933. He included the other stock in his 1934 return and the deficiency determined against him includes a tax on the value of the shares. The gift tax return of Emma L. Staley for 1934 included the 5,000 shares and excluded the remaining shares, 2,000 preferred and 1,000 common, but the deficiency proposed for assessment against her includes all of the stock. Thus, the 5,000 shares were made the subject of a gift tax against the petitioner in 1933 and against his wife in 1934, and like taxes have been determined against both petitioners for 1934 on the remaining 3,000 shares, 2,000 preferred and 1,000 common.

Petitioner Emma L. Staley contends that her transfers in trust are not subject to gift taxes, upon the ground that she never held more than a life interest in the income from the stock and that she retained that interest under the trust she created.

The issue respecting the 5,000 shares of preferred stock was raised at the conclusion of the hearing by an amendment to the petition to conform to the proof. The respondent has filed a motion to strike the amendment, claiming that it does not conform with any proof and may not be availed of under the circumstances to raise a new issue.

The respondent does not claim surprise and there was none. An allegation in the petition of Emma L. Staley that she was the owner of the 5,000 shares of stock at the time they were conveyed to the trustee was denied by the respondent in his answer, and he made no objection to the introduction of testimony relied upon by petitioner Emma L. Staley under the issue. Under the circumstances, the issue was properly raised and amendment properly allowed. Alameda Park Co. v. Lucas, 37 Fed. (2d) 805; Excelsior Motor Mfg. & Supply Co. v. Commissioner, 43 Fed. (2d) 968; International Banding Machine Co. v. Commissioner, 37 Fed. (2d) 660; Commissioner v. Ray, 88 Fed. (2d) 891.

The testimony of petitioner and his wife developed the fact that the gift of 5,000 shares of preferred stock in 1933 was made with the understanding that, upon the creation by the former of trusts in favor of his children with other shares of stock of the company as corpus, the latter would concurrently execute a similar instrument, reserving a life interest in the income from the stock and providing for distribution of the principal to the children upon the termination of the trust. At about the time he created his trusts, the petitioner gave to his wife additional shares of the stock (2,000 preferred and 1,000 common) for a like purpose and with like understanding, in order to increase her annual income from the property.

From these facts it seems clear that as to the 1933 transaction the donor never intended to give his wife more than a life interest in the income earned by the stock, conditioned upon the transfer of the corpus, in trust, for the benefit of his children upon the creation of trusts by him. That he intended to give her a vested life estate in the property, as distinguished from one to go into effect upon the happening of a condition precedent, is fortified by his return of the securities as the subject of a completed gift in 1933. Gifts subject to a condition subsequent, as the one here, are valid. *Richards* v. *Wilson*, 185 Ind. 335; 112 N. E. 780; *Northern Trust Co.* v. *Swartz*, 309 Ill. 586; 141 N. E. 433; *Miller* v. *Western College of Toledo*, 177 Ill. 280; 52 N. E. 432; *Richardson* v. *Penicks*, 1 App. D. C. 261. There was no breach of the condition accompanying the gift. Instead, there was full and complete compliance and thereafter there was no possibility of reverter or liability on the part of the donee to answer in damages for failure to perform.

Compliance with the conditions under which petitioner Emma L. Staley received the stock in 1933 involved nothing more than a reservation of the life interest she already had in the income from the property and provision for distribution of the corpus to the donor's children upon the termination of the trust. She never had power to dispose of the corpus in any other manner. A gift involves voluntary and gratuitous action on the part of the donor. No such action was taken here. The trustor, pursuant to her agreement, retained a life interest in the income from the stock and passed the remainder to the children. Petitioner Emma L. Staley transferred nothing subject to a gift tax.

The facts respecting the gift of 2,000 shares of preferred stock and 1,000 shares of common stock are the same, except for the time intervening between the respective transfers. Relying upon facts submitted by counsel for the petitioner, the Commissioner held that the transaction was a gift from petitioner Augustus E. Staley to the trustee. The effect of his ruling is that, considering the concurrent

transfers from the husband to his wife and from her to the trustee, the two transfers should be regarded as one, and taxable to the husband. That was the substance of the transaction. The transfers were made in this way. On October 19, 1934, petitioner Augustus E. Staley transferred to the trustee certificates for 2,000 shares of preferred stock and 1,000 shares of common stock, and his wife transferred to the trustee certificates for the 5,000 shares of preferred stock that she received from her husband in 1933. Upon the surrender of the stock to the corporation new certificates were issued in the name of the trustee. The stock was never transferred to petitioner Emma L. Staley so as to give her dominion or control over it. If it could be said that the effect of the transaction was a gift of the stock to the trustor and a conveyance by her to the trustee, the result would not be different. These shares of stock were subject to the same verbal understanding as to present and future interests as the stock involved in the 1933 gift, and, accordingly, she was in no position to convey a greater interest in the property. Even if we treat them as two separate and distinct transfers, for the reasons set forth respecting the 5,000 shares of preferred stock, there was no taxable gift of the stock by Emma L. Staley.

Accordingly, we hold that the shares of stock transferred in trust by Emma L. Staley in 1934 are not subject to gift tax.

### FINDINGS OF FACT UPON SECOND ISSUE.

The company was organized by the petitioner in 1906 under the laws of Delaware. All of its capital stock was issued to petitioner. The company was reorganized in 1909, in connection with which petitioner surrendered a portion of his common and preferred stock to the company. Part of this stock was subsequently sold in small lots to about 2,600 customers of the company. Many of them still own the stock. In 1920 and 1921 small amounts of both classes of stock were sold by salesmen of the company to hundreds of investors living in the central part of Illinois. A large part of them are still stockholders of the company. Some of these buyers of small blocks of stock sold their stock to change investments or to meet financial difficulties. Some of the common stock was purchased by the petitioner.

The company issued $600,000 of 6 percent bonds in 1915. These bonds were paid off in 1919 by a new issue of $2,000,000 of 7 percent bonds. The second issue was taken up by an issue of $3,000,000 of 6½ percent bonds in 1923, and these, in turn, were paid off in connection with an issue of $6,000,000 6 percent first mortgage bonds issued in 1927 and maturing September 1, 1942, reduced prior to October 18, 1934, to $4,000,000.

On October 18, 1934, and thereafter in 1934 the capital stock of the company consisted of 100,000 shares, par value $100 each, of 7 percent nonvoting cumulative preferred stock, of which 50,000 shares were outstanding, and 50,000 shares of common stock, par value $100 per share, of which 42,002 were outstanding. Dividends on the preferred stock were payable before dividends on the common stock. The preferred stock was entitled upon dissolution to $100 per share and was subject to redemption at $110 per share on any semiannual dividend date.

On October 18 and 19, 1934, there were approximately 2,100 individual holders of the company's preferred stock, and its common stock was held by about 620 stockholders. Part of the company's stock was held as follows at the close of October 19, 1934:

| | Shares of stock held | |
|---|---|---|
| | Common | Preferred |
| Safe Deposit and Trust Co. of Baltimore, trustee | 31,000 | 17,000 |
| Augustus E. Staley | 5,250 | 4,906 |
| Augustus E. Staley, Jr | | 28 |
| Mrs. Augustus E. Staley, Jr | | 100 |

Petitioner Emma L. Staley did not own any of the stock at that time.

During the years 1930 to 1934, inclusive, the company had two subsidiaries, namely, the Staley Sales Corporation and A. E. Staley Manufacturing Co. (London) Ltd. Petitioner was president and general manager of the company in 1930 and 1931, and since then has been chairman of the board of directors. His son has been president since 1932.

The company's stock was not listed on an exchange. During September, October, and November, 1934, the Chicago Journal of Commerce, a financial paper of general circulation, published bid and asked prices for common and preferred stock of the company. The prices per share published by the newspaper on the basis of information furnished by brokers were as follows on the dates indicated:

| | Preferred stock | | Common stock | |
|---|---|---|---|---|
| | Bid | Asked | Bid | Asked |
| September 18, 1934 | 76½ | 77½ | 40 | 45 |
| October 18, 1934 | 75 | 77 | 33 | 38 |
| November 20, 1934 | 88 | 92 | 55 | 60 |

Bid and asked prices for the stock were also quoted in the Commercial and Financial Chronicle, the National Daily Quotation Service, and weekly quotation sheets published by Swift, Langill & Henke, stock brokers having an office in Chicago, Illinois.

The National Daily Quotation Service has about 3,000 subscribers among investment bankers and brokers in the United States, of whom about 160 are located in Chicago, Illinois, and it is recognized as generally reliable. The prices quoted in the service constitute a record of the offerings and bids of the subscribers for unlisted securities. The quotations form the basis for substantially all of the trading done by brokers in small lots of unlisted securities. The prices quoted in the service are not binding, but the broker making the offer or bid is under an ethical obligation to act in good faith.

The quotation sheets published by Swift, Langill & Henke were sent to from 700 to 800 brokers in and around Chicago. There are about 10,000 dealers in unlisted securities in the United States.

During the week including October 18, 1934, the 6 percent bonds of the company sold for $104.25, or $4.25 in excess of their face value.

The stock market in the early fall of 1934 was at a very low level, and during the last half of 1934 there was practically no financing of common and preferred stock. In September and October, 1934, there was very little demand for inactive stock such as stock of the company. The stock market rose materially during the last six or eight weeks of 1934 and had the effect of increasing the price of stock of corporations in the corn refining industry.

Sales of small lots of the stock were made occasionally in over-the counter transactions. More sales were made in Chicago than any other city. From January 1, to October 19, 1934, the following transfers of common stock were recorded in the books of the company:

| Number of transfers | Shares transferred in each transfer | Number of transfers | Shares transferred in each transfer | Number of transfers | Shares transferred in each transfer |
|---|---|---|---|---|---|
| 30 | 1 | 1 | 4 | 1 | 8 |
| 23 | 2 | 19 | 5 | 7 | 10 |
| 11 | 3 | 1 | 7 | 1 | 62 |

Of the 94 certificates surrendered in connection with the transfers, 48 certificates, involving 130 shares of stock, were not involved in sales.

The common stock of the American Maize-Products Co., a competitor with which the company in some respects was comparable, was listed on the Chicago Curb Exchange. The price range of the stock

during 1934 was from $20 to $36.50 per share. There was a sale of an undisclosed number of shares of the stock on October 29, 1934, through the Chicago Curb Exchange, at $24 per share.

The principal office and manufacturing plant of the company were located in Decatur, Illinois. Most of its sales in the United States were made through the Staley Sales Corporation and practically all of its foreign sales were made through A. E. Staley Manufacturing Co. (London) Ltd.

The principal business of the company was and is that of wet corn milling. It also manufactures products from soy beans, being a pioneer in the industry in the United States.

The products manufactured by the company from corn included starch, unmixed syrup, table syrup, crude corn sugar, gluten feed and meal, and crude and refined corn oils. The corn products were used for edible and industrial purposes, about 60 percent for the former and the remainder for the latter. In addition to household users, the products were used and purchased by manufacturers of candy, baking powder, ice cream, mayonnaise, tobacco, explosives, rayon, paints and varnishes, and syrup mixes, and by bakers, brewers, edible oil refiners, leather tanners, textile mills, and jobbers and grocery distributors. Some of the products were sold under the company's own labels. Ninety percent of the corn used by the company is purchased within a radius of 50 miles of its plant, at about 6½ cents per bushel less than the undelivered market price in Chicago.

Of the soy beans ground by the company, 90 percent was used in the production of oil and oil meal as a food for cattle, and the remaining 10 percent was utilized, among other things, in the manufacture of edible soy bean flour and soy sauce. The soy bean oil is sold in tank cars and the meal is sold in bulk and in bags. 99.9 percent of the company's requirements of soy beans is purchased within less than 50 miles of its plant. The company has the largest single plant in the United States for the processing of soy beans.

The company's plant is located on a large tract and consists of about 50 buildings, each of which generally houses an operating function in the process of production. The plant has a daily capacity of about 50,000 bushels of corn and 10,000 bushels of soy beans. The company has three elevators at or near its plant. One has a capacity of 300,000 bushels and is used exclusively for soy beans, and the other two elevators are used for the storage of corn and have a combined capacity of 3,250,000 bushels.

The company has ten principal competitors in the United States, including the Corn Products Refining Co., its largest competitor, Penick & Ford, Ltd., Inc., the American Maize-Products Co., and the

Clinton Co. In 1934 they ground the following approximate proportions of the corn used in the corn refining industry in the United States:

| Company | Percent | Company | Percent |
|---|---|---|---|
| Corn Products Refining Co | 40 | American Maize-Products Co | 10 |
| A. E. Staley Mfg. Co | 12 to 13 | Clinton Co | 10 |
| Penick & Ford, Ltd | 10 | Other principal competitors | 17 to 18 |

The average number of bushels of corn ground annually by the industry, and the proportion thereof ground by the company, were as follows for the periods indicated:

| Period | Used by— | | Percentage used by Staley Co. |
|---|---|---|---|
| | Industry | Staley Co. | |
| | Bushels | Bushels | Percent |
| 1925-1934 | 76, 122, 000 | 10, 659, 000 | 14 |
| 1926-1934 | 76, 999, 000 | 10, 670, 000 | 13.-9 |
| 1927-1934 | 76, 205, 000 | 10, 309, 000 | 13. 5 |
| 1928-1934 | 75, 228, 000 | 9, 756, 000 | 13 |
| 1929-1934 | 73, 084, 000 | 9, 515, 000 | 13 |
| 1930-1934 | 70, 261, 000 | 9, 321, 000 | 13. 3 |
| 1931-1934 | 67, 837, 000 | 9, 349, 000 | 13. 8 |
| 1932-1934 | 68, 286, 000 | 9, 476, 000 | 13. 9 |
| 1933-1934 | 71, 197, 000 | 9, 983, 000 | 14 |
| 1934 | 70, 540, 000 | 9, 336, 000 | 13. 2 |

The company used the following percentage of the total amount of corn used by the corn refining industry during the crop years indicated:

| Crop years | Percent | Crop years | Percent | Crop years | Percent |
|---|---|---|---|---|---|
| 1924-1925 | 15. 47 | 1928-1929 | 12. 02 | 1931-1932 | 13. 55 |
| 1925-1926 | 16. 27 | 1929-1930 | 11. 52 | 1932-1933 | 14. 79 |
| 1926-1927 | 17. 08 | 1930-1931 | 13. 49 | 1933-1934 | 13. 24 |
| 1927-1928 | 12. 72 | | | | |

The amount of corn used by the industry was less than 5 percent of the quantity produced in the United States. The price per bushel of corn at Chicago in 1918 to 1934, inclusive, ranged from a high of $1.62 in 1918 to a low of 36 cents in 1931, the average being 83 cents.

The corn crop in the United States in 1934 was about one billion bushels less than the average yearly crop since 1918.

The wet corn milling industry has flexibility in the production of its products, which tends to stabilize the industry.

The year 1934 was a subnormal year for business in general, but it showed some improvement over 1932 and 1933.

The average number of bushels of soy beans used in the industry during the years 1928 to 1934, inclusive, and the percentage thereof used by the company were as follows:

| Period | Used by— | | Percentage used by Staley Co. |
| | Industry | Staley Co. | |
|---|---|---|---|
| | *Bushels* | *Bushels* | *Percent* |
| 1928–1934 | 2, 632, 000 | 589, 694 | 22. 4 |
| 1929–1934 | 2, 978, 000 | 652, 260 | 21. 9 |
| 1930–1934 | 3, 396, 000 | 747, 901 | 22 |
| 1931–1934 | 3, 829, 000 | 848, 697 | 22. 16 |
| 1932–1934 | 3, 749, 000 | 846, 822 | 22. 6 |
| 1933–1934 | 3, 261, 000 | 848, 183 | 26 |
| 1934 | 3, 054, 000 | 1, 084, 382 | 35. 51 |

There was an adequate crop of soy beans at all times for the use of the industry.

The operation of the company was generally handicapped by a lack of working capital. Some of the operating units of the company's plant are in excellent condition, others in poor condition. Lack of funds has prevented the company from equipping its entire plant with modern producing units. The company's plant, however, was as modern as the plants of its competitors. The expenditures of the company for repairs each year from 1930 to 1934, inclusive, were as follows:

| | |
|---|---|
| 1930 | $601, 176. 10 |
| 1931 | 470, 804. 57 |
| 1932 | 365, 094. 93 |
| 1933 | 509, 481. 71 |
| 1934 | 555, 258. 59 |

In 1932 the company and its principal competitors signed a consent decree in a suit filed against them in a United States District Court forever enjoining them from entering into any agreement for fixing prices for their products, and, in general, from not competing with each other in the manufacture and sale of corn products.

The export business of the company has dwindled very rapidly since about 1920. The export business it had in 1934 was conducted at a loss. Since 1920 it has had to meet competition of imported starch. The importations of starch from 1920 to 1925 were about 100,000,000 pounds each year. The amount increased thereafter until 1929, when it was 181,000,000 pounds. In 1930, 1931, and 1932 the yearly importations were about 130,000,000 pounds; in 1933, 202,000,000 pounds; and in 1934, 188,000,000 pounds.

The drought in 1934 greatly reduced the harvest of corn in that year and increased the cost of corn to corn processors. The immediate effect of the condition was to increase the company's profits for the last two quarters of 1934 due to inventory profits and speculative

purchasing by the company's customers. It was known that the increased cost of corn would be a disadvantage to the company in competing with other products and imported cornstarch. It would have been reasonable for an intelligent person to conclude from facts known in the fall of 1934 that the corn processing industry would have decreased earnings in 1935.

The net sales and net income of the company and its subsidiaries for the years 1927 to 1934, inclusive, were as follows:

| Year | Net sales | Net income | Year | Net sales | Net income |
|---|---|---|---|---|---|
| 1927 | $19,689,192.18 | $755,365.02 | 1931 | $13,212,447.59 | (loss) $242,255.93 |
| 1928 | 20,647,789.50 | 389,448.87 | 1932 | 8,307,981.03 | 463,996.80 |
| 1929 | 19,338,158.55 | 2,097,809.80 | 1933 | 10,772,829.88 | 1,455,722.01 |
| 1930 | 17,689,543.86 | 154,496.83 | 1934 | 14,023,465.22 | 947,767.93 |

As the result of an agreement reached with the Bureau of Internal Revenue in 1936, adjustments were made on the books of the company in that year for depreciation for Federal income tax purposes. The adjustments decreased the loss sustained in 1931 to $112,914.77 and increased net income in the years 1932, 1933, and 1934 to $565,714.26, $1,578,880.19, and $1,035,776.04, respectively.

The company paid semiannual dividends of $3.50 per share on its preferred stock during the five-year period ending December 31, 1934. During that period it paid the following dividends per share on its common stock:

January 1, 1930 _____ $6
July 1, 1930 _____ 3
January 1, 1931 _____ 3
February 19, 1934, stock dividend _____ 100%

The balance sheets of the company and its subsidiaries as of the close of the years 1933 and 1934 and on September 30 and October 31, 1934, were as follows:

| Assets | 1933 | 1934 | Sept. 30, 1934 | Oct. 31, 1934 |
|---|---|---|---|---|
| Current assets | $5,517,129.32 | $7,811,202.93 | $5,468,570.44 | $6,578,050.65 |
| Investment in own bonds | 310,372.26 | 326,056.15 | 320,498.45 | 322,350.95 |
| Other investments and miscellaneous assets | 222,228.31 | 147,992.93 | 117,632.22 | 103,324.63 |
| Real estate, equipment, less reserve for depreciation | 9,785,309.45 | 9,701,708.96 | 9,733,773.11 | 9,712,169.63 |
| Deferred expenses | 285,688.96 | 293,429.42 | 295,468.73 | 296,483.21 |
| Total | 16,120,728.30 | 18,280,390.39 | 15,935,942.95 | 17,012,379.07 |
| Liabilities | | | | |
| Current liabilities | $970,946.07 | $2,707,840.23 | $712,502.86 | $1,661,260.88 |
| First mortgage bonds | 4,000,000.00 | 4,000,000.00 | 4,000,000.00 | 4,000,000.00 |
| Reserve for contingencies | 450,000.00 | 450,000.00 | 450,000.00 | 450,000.00 |
| Preferred stock | 5,000,000.00 | 5,000,000.00 | 5,000,000.00 | 5,000,000.00 |
| Common stock | 2,100,100.00 | 4,200,200.00 | 4,200,400.09 | 4,200,400.00 |
| Surplus | 3,599,682.23 | 1,922,350.16 | 1,573,040.09 | 1,700,718.19 |
| Total | 16,120,728.30 | 18,280,390.39 | 15,935,942.95 | 17,012,379.07 |

The company's merchandise inventory at the close of 1934 consisted of the following items:

| | |
|---|---|
| Grain | $2, 875, 242. 30 |
| Products in process | 249, 519. 00 |
| Finished products | 1, 265, 383. 57 |
| Milling in transit and prepaid freight | 423, 491. 43 |
| Advances on grain purchases | 20, 997. 86 |
| Manufacturing supplies | 427, 613. 19 |
| Total | 5, 262, 247. 35 |

The items comprising the inventory at the close of each prior year were similar.

In the gift tax return filed by the petitioner for 1934, he reported the common and preferred stock of the company at a value of $35.50 and $76 per share, respectively, these values being the mean of the bid and asked prices for the stock on October 17, 18, and 19, 1934, as published in the Chicago Journal of Commerce. The method used by the petitioner was in accordance with the procedure followed by the Commissioner in determining the gift tax on the gift made by the petitioner in 1933 of 5,000 shares of preferred stock to his wife and in accordance with instructions received from a representative of a collector of internal revenue. In his determination of the deficiency the Commissioner held that each class of stock had a value of $100 per share.

On October 18, 1934, the common stock and preferred stock of the company had a value of $42.50 and $85 per share, respectively.

### OPINION.

The petitioner contends that he returned the gifts at values determined in accordance with the provisions of Regulations 79 and that, accordingly, the respondent is in no position to challenge the correctness of the rule prescribed by him. Petitioner refers particularly to paragraphs 3 and 4 of article 19 (3), reading:

If the securities are not listed upon an exchange, but are dealt in through brokers, or have a market, the value should be determined by taking the mean between the highest and lowest selling prices as of the date of the gift, or, if there were no sale on that date, of the nearest date either before or after the date of the gift upon which sales were made, if within a reasonable period. If quotations are obtained from brokers, or evidence as to the sale of securities is obtained from the officers of the issuing companies, the donor should preserve in his files the letters furnishing such quotations, or evidence of sale, for inspection when the return is verified by an investigating officer.

If securities are quoted on a bona fide bid and asked basis, and actual sales are not available, the mean between the bid and asked prices on the date of the gift, or if not quoted as of the date of the gift, the mean between such prices on the nearest date thereto within a reasonable time, will be accepted as the value.

In arriving at his valuation the respondent held "that the sale value of the stock of this corporation in small lots does not reflect the fair market value thereof as of date of the gifts." We concur in this conclusion of the respondent. The members of the Staley family held 22,034 shares of the corporation's 50,000 shares of preferred stock, the remainder of 27,966 shares having been in the hands of about 2,100 individuals, an average of about 13 shares per stockholder. The common stock was more closely held. Petitioner held 36,250 shares and the remainder, 5,752 shares, was in the hands of about 620 stockholders, an average holding of about 9 shares per stockholder. The stock was not listed upon an exchange.

Such evidence as there is in the record on actual sales of the stock consists of letters from purchasers, sellers, and brokers on the subject. An analysis of these exhibits shows that 269 shares of common stock, in lots of from 2 to 62 shares, were sold between April 13, 1934, and November 22, 1934, at prices ranging from a low of $36 on October 22, this being the sale, of five shares, nearest the basic date, to a high of $60 on September 25, and that 529 shares of preferred stock, in lots of from 5 to 50 shares, were purchased between May 7 and November 20, 1934, at prices ranging from $74.75 per share on September 28, 1934, to $88 on November 16, 1934. The sale of preferred stock nearest the basic date involved 17 shares at $77 per share. Some were bought and sold through stock brokers; otherwise we know nothing about the circumstances surrounding the sales. Petitioner testified that the stock was sold by stockholders "when they get in hard luck or change investment or sometimes go broke." Other evidence shows a few sales were made to take a profit resulting from a rise in the selling price. Petitioner's testimony, however, when considered with the record of actual sales, demonstrates that there was no active market for the securities.

It is clear that the transactions do not establish a market for 31,000 shares of common stock and 12,000 shares of preferred stock, the volume involved herein. This conclusion is supported by witnesses, including stock brokers, for the petitioner, who testified that there was no market for large blocks of the stock.

Bid and asked prices for small lots of the stock were quoted in the National Daily Quotation Service, a publication having about 3,000 subscribers among stock brokers (of whom there were about 10,000 in the United States in 1934) and investment bankers; in the Chicago Journal of Commerce, a financial paper having a general circulation; in the Commercial and Financial Chronicle, and in a weekly publication of Swift, Langill & Henke, Chicago stock brokers. The quotations of the Commercial and Financial Chronicle are not in evidence. The quotations in the Chicago Journal of Commerce

covering the period from September 18 to November 20, 1934, disclose bid and asked prices on September 18, 1934, of 76½ and 77½, respectively, for the preferred stock, and 40 and 45, respectively, for the common stock, and one point less for the preferred and seven points less for the common stock on October 18, 1934. Thereafter to November 20, 1934, the amount of the quotations increased gradually to 88 bid and 92 asked for the preferred stock and 55 bid and 60 asked for the common stock. The prices quoted in the National Daily Quotation Service on October 17, 18, 19, 23, and 24, 1934, and in the publications of Swift, Langill & Henke on October 13 and 20, were substantially the same as the quotations in the Chicago Journal of Commerce.

Considerable testimony was offered by the petitioner on the force of the quotations appearing in the National Daily Quotation Service in establishing market value. The testimony of witnesses for the petitioner established, in effect, that the quotations are not bona fide in the sense that the parties are under a legal obligation to trade at the bid and asked prices, being only a basis for negotiations on a selling and purchase price; that the service is consulted by brokers to obtain the bid and asked prices for a security for which an order has been received, and is regarded by brokers as a reliable source of information on the market price for unlisted stock.

It does not appear from the record that any sales were made at the quoted prices, but it is shown that some stock was purchased without any apparent regard for the quotations. On September 25, 1934, an individual purchased two shares of common stock at $60 per share. The published quotations for the stock in the Chicago Journal of Commerce on that date were 40 bid and 45 asked. In three transactions in November 1934 involving the purchase through a broker of a total of 26 shares of preferred stock, the purchaser paid on each occasion not less than $4 per share in excess of the asking price quoted in the Chicago Journal of Commerce. The record also discloses that on November 22, 1934, one broker sold 10 shares of preferred stock at 77½ and two other stock brokers purchased at 8½ to 10 points above 77½. Other similar discrepancies appear between the quotations and actual selling price. The quotations on bid and asked prices were properly admitted in evidence. *Rice v. Eisner*, 16 Fed. (2d) 358; *Western Bank & Trust Co.*, 19 B. T. A. 401. But, like the sales of small blocks of stock, the quotations are not, under the circumstances, conclusive as to the fair market value of the shares in question, and the Commissioner was under no obligation to use them as an absolute guide.

Not having used bid and asked quotations or the selling price of small lots as reflecting the fair market value of large blocks of the

company's stock on the basic date, the Commissioner apparently regarded the case as one requiring consideration of other elements and factors and, therefore, falling within the provisions of the concluding paragraph of article 19 (3) of Regulations 79.[1]  Such action was proper.

The amount of any gift is the value thereof at the date of the gift.  Sec. 506, Revenue Act of 1932.  We may assume here, as we did in *John J. Newberry*, 39 B. T. A. 1123, that the term "value" means fair market value.  In that case, based upon a review of many decisions on the subject, we said that "the definition [of fair market value] may be stated as the price which would probably be agreed upon by a seller willing, but under no compulsion, to sell, and a buyer willing, but under no compulsion, to buy, where both have reasonable knowledge of the facts."  The parties here are in substantial accord with that definition of the term.

Generally the prices at which stock is bought and sold in an open market are the best evidence of value.  *Grant Co.* v. *Duggan*, 94 Fed. (2d) 859; *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513; *Helvering* v. *Security Savings & Commercial Bank*, 72 Fed. (2d) 874; *Susan T. Freshman*, 33 B. T. A. 394.  Such sales, however, are not always conclusive.  *Helvering* v. *Kendrick Coal & Dock Co.*, 72 Fed. (2d) 330; *Heiner* v. *Crosby*, 24 Fed. (2d) 191; *Robertson* v. *Routzahn*, 75 Fed. (2d) 537; *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, 95 Fed. (2d) 806; and *Hazeltine Corporation* v. *Commissioner*, *supra*, in which the court said:

\* \* \* It is true that if market sales are made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, they may not furnish evidence of fair market value. \* \* \*

The object of the inquiry here is to determine the value of large blocks of stock.  This can not be properly done by confining our consideration to sales of and quotations on small lots.  *Virginia* v. *West Virginia*, 238 U. S. 202.  The circumstances require us to give consideration to every relevant fact of record having a bearing upon the question.  *Crawford* v. *Helvering*, 70 Fed. (2d) 744; *Heiner* v. *Crosby*, *supra; Laird* v. *Commissioner*, 85 Fed. (2d) 598; *Standard Oil Co.* v. *Southern Pacific Co.*, 286 U. S. 146.  Our duty in that regard may not be limited by a regulation of the Commissioner.  *Commissioner* v. *Shattuck*, 97 Fed. (2d) 790; *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, *supra; Helvering* v. *Kimberly*, 97 Fed. (2d) 433; *Laird* v. *Commissioner*, *supra*.

---

[1] "In exceptional cases in which it is established by clear and convincing evidence that the value per bond or share of any security determined upon the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, other relevant facts and elements of value will be considered in determining the fair market value. \* \* \*"

Upon brief the petitioner requests us to find that the fair market value of the common stock was between $20 and $30 per share, and that the preferred stock had a value of between $60 and $72 per share. The respondent argues that the evidence supports his finding of a value of $100 per share for each class of stock.

Witnesses for the petitioner testified to values of from $20 to $30 per share for the common stock and values of $60 to $77 per share for the preferred stock. The lower values for the stock are supported by opinions of stock brokers who had some correspondence with petitioner at about the basic date concerning the purchase of a large block of stock for retail to the public through their brokerage firms. None of them ever made an offer to purchase any quantity of the stock at any price, and the petitioner did not at any time indicate what he would accept, or set a figure for negotiation purposes. In fact, some of the correspondence was conducted after the petitioner had completed his gifts, leaving him owning but 5,250 shares of common stock and 4,906 shares of preferred stock. It does not appear that he was ever willing to dispose of such holdings at any price. That petitioner was never willing to accept any of the alleged offers of brokers is indicated by a statement appearing in a letter to one of them that a price of $60 per share for the preferred stock seemed to be a "little low" and his testimony in the record that the value of $35.50 per share for common stock and $76 per share for the preferred stock, at which the stock was returned by him for gift tax purposes, was a "fair cash value."

In order to find values at the lowest amounts urged by the petitioner it would be necessary to completely ignore opinions of witnesses who, from experience and studies made of the market and the corn-grinding industry in general and the company in particular, were better qualified to express opinions on the value of the stock than the brokers whose sole interest was to acquire blocks of the stock at a price that would insure them a profit on resale in small lots to the public. One of these witnesses testified to a valuation of $25.50 per share for the common stock; the others $30 per share. As to the preferred stock, two of petitioners expert witnesses testified to the value of $76 per share, one $1 less, and another an undisclosed value less than $75, a price he regarded as the value of the stock in small lots. Petitioner's son, a beneficiary of one of petitioner's trusts and an active officer of the company, was of the opinion that the preferred stock had a value of between $75 and $77 per share.

The two expert witnesses of respondent were each of the opinion that the preferred stock had a value of $100 per share. One of these experts testified that the common stock had a like value and the

other expert was of the opinion that it had a value of from $100 to $110 per share.

There is no apparent need for attempting to point out in detail the reasons for the wide difference of opinion between expert witnesses for one party and the other as to the value of the stock. It is due in part to methods employed in reaching their result, their estimation of the stability of the corn-processing industry, particularly the company's position therein, the effect of the capital structure of the company on the value of the stock, the extent to which, if at all, sales of small lots of the stock reflect the value of large blocks, and the period of years that should be used as a guide to future earnings.

One of the respondent's expert witnesses, an experienced banker, undertook to fix the value of the stock by making comparisons between the company and other corporations engaged in the wet process corn-grinding industry. He did not think the sales of small lots established a fair market price for the stocks and gave no consideration to bid and asked prices. The witness selected the Corn Products Refining Co., Penick & Ford, Ltd., Inc., and the American Maize-Products Co. for purposes of comparison and computed ratios of net worth and earnings to selling price for their stock. He found that the selling price for common stock of the American Maize-Products Co., which he regarded as being more comparable to the company than the other two corporations, at $24 per share was 1.37 times its net worth and 9.96 times its average yearly earnings over a period of seven years ending with 1934. Application of these ratios to the net worth of the company and its average annual earnings for seven years ending with 1934 results in a value of about $200, and $95.42 per share, respectively. The use of earnings of the two corporations for 1934 and average earnings for two, three, four, five, and six-year periods, ending with 1934, produces values ranging from a low of $62.78 for the five-year period commencing with 1930, to a high of $231.80 for the years 1933 and 1934. The use of earnings for 1934 and the average for 1932, 1933, and 1934 results in a value of about $190 per share. Irrespective of the difference in the results reached by application of the methods to the company's financial condition, no effort was made by the witness to harmonize the conflicting figures and he expressed no preference for one method over the other. He regarded a period of seven years as a "fair selection of years."

Aside from the showing made by the use of the two methods that the companies are not comparable, other reasons appear for not blindly following the witness' conclusion. The methods assume that the price of $24 per share represents the fair market value of common stock of the American Maize-Products Co. on the basic date. The

basis for the assumption is a single sale of an undisclosed number of shares through the Chicago Curb Exchange on October 29, 1934. The respondent is in the position of asking us to accept that sale as establishing fair market value of the stock of the comparative while declining to accept unexplained sales of small lots of the company's stock or bid and asked prices as establishing a market price for the company's stock. The range of prices per share for the stock in 1934 was from $20 to $36.50 and the price may not represent the fair market value on the basic date for a large block of the stock. Neither does the record show the volume of trading in the stock. The American Maize-Products Co. had only a small amount of outstanding preferred stock, no bonded indebtedness, paid out substantially all of its net income in 1932, 1933, and 1934 in dividends, and was not engaged in the soy bean industry.

Evidence introduced into the record by the respondent shows that purchasers of common stock of the American Maize-Products Co. did not rely altogether upon earnings or net worth of the corporation in deciding the amount they would pay for the stock. In 1934 the corporation earned $1.81 per share and the mean average market price for its common stock was $28.25 per share. In 1933 earnings were at the rate of $2.40 per share, yet the stock sold for an average of $2 less per share. In 1932 the corporation's earnings were $1.29 per share and the mean average market price of the stock was $14.81 per share. During that period there was no substantial change in the net worth of the corporation. The mean average market price per share of common stock of the Corn Products Refining Co. and Penick & Ford, Ltd., Inc., in 1934 was, respectively, 22.15 and 14.68 times earnings.

The witness testified that his opinion of the fair market value of the preferred stock was based upon the company's record of earnings and dividend payments.

The valuations of the other expert witness for the respondent are based upon a study of the financial history and market for stock of the company and other corporations in the industry and consideration of other factors he considered necessary to arrive at an opinion on the value of the stock. He gave little weight to sales of small lots of the stock and quoted bid and asked prices. His testimony, as the respondent concedes, is substantially the same as the testimony of respondent's other expert witness.

As we have already pointed out, the witnesses for the petitioner who testified to values for the common stock of less than $30 per share were stock brokers whose primary interest was to acquire blocks of the stock at a price sufficiently below the bid and asked prices at that time to assure them a profit upon resale to the public in small lots. We attach no great weight to their opinions. Neither

does testimony of another witness for petitioner, a dealer in stocks and bonds, that he would have paid the bid and asked prices for the stock, aid us much in deciding the question.

Analysis of the basis for the valuation of $30 per share for 5,000 shares and an undisclosed amount less than $30 for 31,000 shares expressed by another witness for the petitioner, an investment banker, shows his opinion to have little value. It resulted in part from a conclusion that the company's 6 percent bonds were selling in January 1934 to yield a return of 8.1 percent and that the common stock was subject to a prior charge of $17.50 per share for interest and sinking fund requirements on bonds, and preferred stock dividends. The bonds were selling for $104¼ during the week of October 18, 1934. Why he considered it proper to use a lower price ten months earlier does not appear. Obviously the price on the basic date should have been used. It does not appear that the company's outstanding bonds in 1934 had sinking fund requirements. The 4 percent bonds issued by the company in 1936 did have such requirements. The charges for bond interest and preferred stock dividends in 1934 were at the rate of $14.05 per share of common stock, $3.45 less than the charges determined by this witness, or about $145,000 per year.

Another witness for the petitioner approached the problem in very much the same manner as the expert witnesses produced by the respondent. He found that the securities of other corporations in the industry were selling on the market for a certain amount times their average yearly earnings over a five-year period ending with 1934. This period is the most favorable for the petitioner. We do not know the market price he used for preferred and common stocks and bonds of the comparables he used. He determined that the securities of the American Maize-Products Co. were selling for 12.63 times the earnings, and those of the company, pricing the bonds at $104, preferred stock at $76 per share and common stock at $31 per share, at 10.7 times earnings. We know from evidence produced by the respondent that there was a sale of an undisclosed number of shares of common stock of the American Maize-Products Co. on October 29, 1934, at $24 per share. If that price was used by the witness, a value of about $30 per share for common stock of the company is not in line with the ratios employed in the computation.

One of the other two expert witnesses for the petitioner testified to a value of $25.50 per share for the common stock, and the other one "somewhat less" than $30 per share. Each was of the opinion that the preferred stock had a fair market value of $76 per share. Their opinions are based upon facts assumed in a hypothetical question and a capitalization of earnings. The difference in the results they reached is due, in part, to the amount of earnings which they concluded an investor could expect in the future and that was gov-

erned largely by the period of time used as a guide. One capitalized the earnings at 10 percent; the other at 9 percent. Both of the witnesses expressed considerable doubt about the accuracy of any result reached by capitalizing earnings because of the large amount of senior securities of the company and its erratic earnings in prior years. One expressed the view that it would not be unreasonable to deduct, under the capitalization method, an amount for outstanding bonds and preferred stock based upon their market price, $104 for bonds and $76 per share for preferred stock, instead of an amount computed at their face values. If he had employed such a method, he would have reached a value of about $58 per share for the common stock. The answer of each witness to the hypothetical question is based upon an erroneous assumption that the petitioner was willing to accept $30 per share for a large block of the stock and that there were willing buyers at a price under $30 per share. Their valuations of the preferred stock is based, in general, upon the bid and asked prices for small lots, and assets and earnings disclosing that the amount was also the proper value for a large block.

The petitioner had the burden of proving the Commissioner's valuation to be wrong. While he has succeeded in establishing a value of $100 per share for each class of stock to be excessive, we are not convinced from a careful consideration of all of the evidence that the proof supports the values he asks us to find. In general, we think petitioner's expert witnesses gave too much weight to the prices for which small lots of the stock were sold and minimized the company's earning capacity. They are practically unanimous in their conclusions that the stock was speculative, as distinguished from an investment security. Its earnings were not uniform from year to year and an average over any period of years establishes nothing more than an unreliable trend. Earnings of about $2,100,000 in 1929 decreased to about $155,000 in 1930 and to a loss of $242,000 in 1931. It is evident that 1929 was an abnormal year. The uncertainty of earnings was largely due to fluctuations in the price of corn, and it was known in 1934 that the prevailing high price of corn would result in low earnings in 1935. Past earnings could not be depended upon to make much more than a guess as to future earnings. In 1934 gross sales were about $3,000,000 in excess of 1933, yet the earnings for that year were about $500,000 less than those for 1933. Gross sales in 1930 were about $7,000,000 more than 1933, but the earnings were in reverse order, $155,000 against $1,455,000. The company's earnings in 1934 were about 15.5 percent of its book net worth. In that year the American Maize-Products Co. earned about 10.4 percent of its book net worth. Lack of working capital was a chronic difficulty of the company. At the close of 1934 it had notes outstanding in the amount of $1,600,000.

Although the net income of the company fluctuated considerably from year to year, it did earn each year from 1927 to 1934, inclusive, except 1930 and 1931, an amount in excess of preferred stock dividend requirements. A large part of the earnings ordinarily available for dividends on common stock was required for additional plant facilities and equipment. Only a small amount from 1929 to 1934 was paid out in dividends on common stock. During that period, however, the company met the semiannual dividend requirements on its preferred stock. A corporation's dividend record is an important factor in determining the value of its stock. *Eleanor Lansburgh, Administratrix*, 35 B. T. A. 928. Earnings, however, are only an element in arriving at fair market value under the circumstances involved herein. *Griffiths* v. *Commissioner*, 70 Fed. (2d) 946; *Rheinstrom* v. *Willcuts*, 26 Fed. Supp. 306.

The weight of the evidence is that the company had an excessive amount of outstanding securities senior to the common stock. These securities, consisting of bonds and preferred stock, created an annual charge of about $14 per share on the common stock. The presence of these securities in the capital structure of the company made the common stock less attractive to investors than like stock of other companies in the industry, such as the American Maize-Products Co., which had no bonded indebtedness and only a small amount of preferred stock. This is not only supported by the testimony, but appears to be reflected in the quoted price for preferred stock of the American Maize-Products Co. The senior securities of the American Maize-Products Co. consisted of 2,104 shares of 7 percent preferred stock, par value $100 per share. In 1931 and thereafter through 1934, the quoted bid and asked prices for the stock ranged from a low of $114 to a high of $120 per share. These prices were doubtless also influenced somewhat by the corporation's ratio of current assets to current liabilities, being 12.6 in 1934 in comparison with the company's ratio of 2.88. The difference in the capital structure of these corporations was responsible for much of the disparity in prices of their stock.

Some of the witnesses for the petitioner based their opinions, in part, upon the fact that a large block of stock was worth less per share than a small block. None of them measured the difference in dollars. Although their opinion, in general, was that large blocks depress the market price, practically all of petitioner's expert witnesses fixed the value of the preferred stock at or about the selling price for small lots.

We may not assume that a large block of stock is worth less per share than a small lot, the blockage rule being a matter of evidence. *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259; *Jenkins* v. *Smith*, 21 Fed. Supp. 251; *Richardson* v. *Helvering*, 80

Fed. (2d) 548. Such testimony as there is in the record on the point is not very helpful. *Gamble* v. *Commissioner*, 101 Fed. (2d) 565. A desire to obtain control of a corporation through the acquisition of a large number of shares might enhance the value. *Frank J. Kier et al., Executors,* 28 B. T. A. 633; *Rice* v. *Eisner*, 16 Fed. (2d) 358; *Phillips* v. *United States,* 12 Fed. (2d) 598.

The foregoing brief discussion of the facts and testimony of the various witnesses discloses the difficulty of the problem confronting us. Some of petitioners' witnesses acknowledge, in effect, that because of the peculiar facts of the case equally qualified experts could reasonably arrive at different results. That conclusion of these witnesses is reflected in the valuations expressed by the experts for the respective parties. As we have already indicated, we think that, in general, petitioners' experts did not give sufficient weight to facts indicating valuations in excess of the values at which the stock was returned for gift tax purposes and that the respondent's expert witnesses were inclined to be too optimistic.

Practically all of the valuations of the witnesses are based, in part, upon prior earnings. The average annual earnings for periods of years including 1934 differ considerably because of the wide fluctuations in the income of the company from year to year. We think that the year 1929 was abnormal and should not be given the same weight as other years in estimating future earnings. The average yearly earnings from 1927 to 1934, inclusive, excluding 1929, available for dividends on common stock were about $200,000 or about $5 per share.

The difference between the valuations placed upon the preferred stock by the witnesses for the respective parties is attributable, in general, to their conclusions on whether the stock was a speculative or an investment security. The ratings, in turn, were judged largely by the company's earning record and the presence in its capital structure of bonds, a senior security. At the selling price of $76 per share the stock produced an annual return of 9.2 percent. This rate of return appears excessive during the year involved, considering the financial position of the company and its earning and dividend record. Within about one month after the basic date the stock was quoted at $88 bid and $92 asked and a small lot was sold for $88 per share.

Earnings, however, are only one of the elements to be considered in determining the value of stock. Taking into consideration all of the evidence relating to the question, we find that on October 18, 1934, the common stock had a value of $42.50 per share, and that the preferred stock had a value of $85 per share.

*Decision will be entered under Rule 50.*