## AMES v. O'MALLEY, Collector of Internal Revenue.

### Civ. A. No. 13–48.

United States District Court
D. Nebraska, Omaha Division.

July 3, 1950.

———◆———

C. Petrus Peterson and James N. Ackerman, Lincoln, Neb., for plaintiff.

William B. Waldo, and Francis Donahoe, Washington, D. C., Joseph T. Votava, United States Attorney, Omaha, Neb., for defendant.

DONOHOE, Chief Judge.

This is a suit to recover the amount of a deficiency assessment levied by the Collector of Internal Revenue and paid by the petitioner under protest. In determining the deficiency the Collector increased the net income of the petitioner by reducing the basis of certain shares of stock on which a capital gain was realized in 1943 as a result of a taxable exchange. In that year the taxpayer exchanged 180 shares of stock in Bankers Life of Nebraska for 18,000 trust certificates, which, by stipulation, have a value of $30 each, or a total value of $540,000. This means that for each share of Bankers the taxpayer received property worth $3,000; consequently the amount realized on the exchange is not in dispute. The taxable gain is computed by subtracting from the amount realized the basis of the stock exchanged. This property was acquired prior to March 1, 1913, and the parties agree that the March 1, 1913 value is higher than the adjusted basis to that date. Therefore we are able to focus our attention on a single issue: What was the fair market value of Bankers' stock on March 1, 1913? This will be the basis for computing the gain. 26 U.S.C.A. § 113(a) (14).

Pinpointing the issue does not in itself solve our difficulties. The valuation of an intangible asset as of a certain date is one of the most complex problems with which courts are forced to deal. In legal appraisals the problem of value is often obfuscated by an inaccurate or insufficient definition of value as the "fact to be found". We can derive from the substantive law only formal definitions, so broad as to leave the close questions of meaning entangled with inquiries as to the relevance and weight of evidence. For instance, the present Revenue Code provides that all property, except inventories, should be appraised at "fair market value". 26 U.S.C.A. § 113 (a) (1) to (22). The ambiguities of this definition of value become immediately apparent. What is the "market" value is not always the "fair" value, and vice versa. In many situations there is no market for the property in question. What test should govern then? The law tells us that fair market value is a question of fact and in determining the March 1, 1913 fair market value of stock in a corporation due regard

should be given to the fair market value of the corporate assets on that date. 26 U.S. C.A. § 113(a) (14); Treas.Reg. 111, Sec. 29-113(a) (14)-1(c). Let us assume that this standard removes all the confusion as to exactly "what value" we are searching for. The appraisal of the stock in question is still fraught with difficulty. "This is necessarily true because valuations involve economic prophecies based on a complex and highly controversial technique of inferences from the known to the unknown." See I Bonbright, Valuation of Property, Chap. VII, p. 127.

There is little dispute in this case with respect to the known. The assets of the corporation, the insurance in force, the dividends paid, the capital contributions, and many other factors which might be given weight in determining the value of the stock, are not contested. Most of these facts have been stipulated. The difficulty arises in crossing the transcendental divide from the known to the unknown. How much weight, if any, should each of the above factors be given in solving our problem? What formula should be used? In brief, we are asked to criticize these "highly controversial techniques of inferences" and accept the most reasonable. The court, recognizing the insurmountable difficulties of the task, aware of its incapabilities in the field, but obligated by virtue of its authority, has analyzed, in the best manner at its disposal, the maze of evidence and myriad of confusing formulae introduced at the trial to aid in the solution of the problem.

█ We may start with the basic, but somewhat empty, proposition that fair market value is the price which a willing and informed purchaser, under no compulsion to buy, would pay for an article to a willing and informed seller, under no compulsion to sell. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236. Actual sales are good evidence of the market, but in this case we are dealing with the stock of a closely held corporation and there were no actual sales at or near March 1, 1913. Of course, such sales are not essential to the determination of market value. As Judge Woodrough points out in Helvering v. Ken-

drick Coal & Dock Co., 8 Cir., 1934, 72 F.2d 330, 333: "To ascertain the fair market value of property, as the Treasury Regulations above quoted import, it is not necessary that the property actually shall have been sold in a market. Where personal property is sold in a definite and established market, or changes hands for money so regularly that a market price for it is created or maintained, it is obvious that it must have a fair market value. When the question arises as to its fair market value in litigation, the question merely is as to the price it commanded in the market at the particular time. Where, however, there is no such market, but the property has an intrinsic value, then the evidence must show what price that intrinsic value would command on a market where willing buyer and willing seller met." With this in mind, we shall consider the first method introduced at the trial to prove the fair market value of Bankers' stock on March 1, 1913.

I

*Valuation of Assets Underlying Stock*

A common method of valuing stocks which are not ordinarily sold on the open market is to determine the value of the tangible assets underlying the stock and then assign each share its proportionate part of these assets. See 10A Mertens, Law of Federal Income Taxation, Sec. 59.26-59.28, p. 55, and the multitude of cases cited. We are aware of the weak assumption on which this formula is based, i. e. equality between the so-called asset values and share values. II Bonbright, Valuation of Property, p. 1056. However, since both the Internal Revenue Code and the court decisions have indicated there is some merit in this method of valuation, we have carefully considered the plaintiff's evidence along this line. Both Mr. Lounsbury and Mr. Best gave expert opinions as to the value of the stock. These opinions were based upon the value of the insurance in force, the stockholder's equity in the deferred dividend reserve, the capital contributions, and finally the stockholder's interest in certain surplus. The court recognizes the expert skill of these witnesses and is constrained to accept, as far as credible, their testimony in the matter. But, in

view of the slight divergence in their conclusions, we deem it necessary to reconsider the factors upon which their opinions are based.

(a) *Deferred Dividend Reserve.* On December 31, 1912, Bankers had a deferred dividend reserve of $1,464,910. The question arises as to what extent, if any, this reserve should be considered in valuing the assets of the corporation for the purposes of computing the fair market value of its stock. In the case of a mutual company the entire reserve should be considered since all the surplus funds belong to one group, the policyholders. Duffy v. Mutual Benefit Life Insurance Co., 272 U.S. 613, 47 S.Ct. 205, 71 L.Ed. 439, held that legally required reserves constitute an investment of capital for the purpose of determining the excess profits tax limitation. Moncure v. Atlantic Life Insurance Co., 4 Cir., 1930, 44 F.2d 167, extended this doctrine to stock as well as mutual companies. It should be noted, however, that these cases do not quite cover the situation under consideration. It is not a question of whether the reserve is invested capital for the purpose of ascertaining the excess profits tax, but rather a question of the consideration which a willing purchaser would give this reserve item in determining a fair price for the corporate stock. In a stock company there are obviously two conflicting interests in a reserve which is "set apart, apportioned, provisionally ascertained, calculated, or held awaiting apportionment upon certain deferred dividend policies". The evidence indicates that, in the discretion of the corporate directors, the assets underlying the reserve could be used for the benefit of the stockholders as well as the policyholders. There was a fixed liability to neither. See New York Life Insurance Company v. Bowers, 283 U.S. 242, 245, 51 S.Ct. 399, 75 L.Ed. 1005. Distinguish Lucas v. Alexander, 279 U.S. 573, 49 S.Ct. 426, 73 L.Ed. 851, 61 A.L.R. 906, in which the insured was given an option at the end of a certain period of receiving on each policy the sum of $50,000 "and in addition the cash dividend then apportioned by the company". Exercise of this option would to a certain extent fix the liability of the company to the policyholder. However, merely because one policyholder has an ascertained interest in the reserve, this does not mean that the entire reserve should be considered as a fixed liability to policyholders; the decision in Lucas v. Alexander is not quite that broad.

A willing purchaser, aware that the assets underlying the deferred dividend reserve are primarily available for the protection of the policyholders even though they may also be used for the stockholders, would certainly value the assets at less than full value in determining a fair price for the stock. How much less we can not say. Mr. Lounsbury testified that the reserve should be valued at only 30.6% of its total value. In other words, the reserve should be considered an asset to the extent of $479,187.74. This figure is persuasive because it reasonably reflects the conflicting interests and does not resolve itself in an extreme forcing us to consider all of the reserve underlying assets or none of them. Mr. Best, on the other hand, considers this asset as making the business more or less self supporting and therefore a better investment. He does not affix any value to the reserve itself, as representing underlying assets, but does consider it in fixing the value of the insurance in force, as we shall see later.

(b) *Value of Insurance in Force.* On March 1, 1913, Bankers had $38,841,915 insurance in force. Mr. Best testified that, in his opinion, the insurance in force was worth $37 per thousand. This seems somewhat high in view of Mr. Lounsbury's appraisal at $20 per thousand. But, as we noted above, Mr. Best was considering the value of the insurance in the light of the deferred dividend reserve, while Mr. Lounsbury considered this reserve as a separate asset and valued it as such.

(c) *Capital Stock.* No one disputes the fact that the capital contributions should be considered an asset to the extent of $100,-000.

(d) *Surplus.* In 1912, Bankers had surplus on hand, not heretofore considered, of $13,372. In 1913, it had surplus of $34,-996. Since Exhibit 9 shows that Mr. Best

466

made a slight mistake in using the figure $15,372 for 1912, we have recomputed the March 1, 1913 surplus, using the same method of interpolation which Mr. Best used.

March 1, 1913 surplus equals:

$$\$13{,}372 \text{ plus } \frac{\$34{,}996}{6} - \$13{,}372 \text{ ; or } \$16{,}976.$$

Thus, Mr. Best considered the surplus to the extent of $16,976. Mr. Lounsbury considered this surplus only to the extent of $5,370.

*Recapitulation.* Correcting the slight error which appeared in Mr. Best's computation and using the underlying asset method of valuation, we find the value of the stock as follows:

| Asset | Value | |
|---|---|---|
| | Best | Lounsbury |
| Insurance in Force | $1,437,150 | $ 776,838 |
| Deferred Dividend Reserve | 0 | 479,187.74 |
| Capital | 100,000 | 100,000 |
| Surplus | 16,976 | 5,370 |
| Totals | $1,554,126 | $1,361,395.74 |

Dividing by 1,000, the number of shares, we find the value of each share to be:

$1,554.13          $1,361.40

If we assume that both methods used by these experts have advantages and accept a mean figure as the most accurate, the stock would have a fair market value March 1, 1913, of $1,457.77, per share. The court is aware of the shortcomings of this figure, but has given it considerable weight in view of the provision of the Internal Revenue Code requiring due regard to the fair market value of the corporate assets in ascertaining the fair market value of the corporate stock. But, let us consider the other methods of valuation which may aid in the solution of our difficulty.

## II

### Earning Power

The earning power of a corporation is usually a very important factor in determining the value of corporate stock. As Justice Brewer stated in the Adams Express Company Case, (Adams Express Co. v. Ohio State Auditor), 166 U.S. 185, 222, 17 S.Ct. 604, 606, 41 L.Ed. 965: "Business men do not pay cash for property in moonshine or dreamland. They buy and pay for that which is of value in its power to produce income, or for purposes of sale." Some noted authorities in accounting believe that earning power is the controlling factor affecting the judgment of one about to invest in corporate stock. Paton, Accountant's Handbook, 3d Ed., 1949, p. 464, citing Frank, Journal of Accountancy, Vol. 68. While specific formulas devised to value corporate stock in terms of earning power may vary in some respects, they are usually based on substantially the same theory, i. e. a calculation of the corporate earnings applicable to each share annually and a valuation of the share at, say, 10 or 20 times this amount. See II Bonbright, Valuation of Property, Chap. 29, p. 1060. In the present case two of the experts have figured an "earning ratio", which may be used as a multiple of the annual earning per share. Mr. Johnson, a witness for the plaintiff, found this ratio to be 10. Mr. Middendorf, a witness for the defendant, found an "earning ratio" of 10.8. These figures do not necessarily represent the same factors, but there is a reasonable relation between them since both are based on an analysis of the stock price and earnings of certain insurance companies whose stock was on the market in 1913. The difficulty with the present method of valuation is in determining the earnings per share of Bankers. A multiple of 10 would be agreeable to both parties, but there is such complete divergence as to the earnings of Bankers per share that this modicum of agreement is little consolation.

From Exhibit 9, the court has computed the earnings of the corporation for a five-year period prior to March 1, 1913, as follows:

| Year | Capital | Def. Div. Reserve | Surplus | Dividends |
|------|---------|-------------------|---------|-----------|
| (Col. 1) | (Col. 6) | (Col. 7) | (Col. 9) | (Col. 10) |
| 1907 | $100,000 | $ 362,592 | $10,981 | $ 6,000 |
| 1912 | 100,000 | 1,464,910 | 13,372 | 6,000 |

Total increase for the five-year period:

| | None | 1,102,318 | 2,391 | 30,000 |

Average annual increase for the five-year period:

| | None | 220,463.60 | 478.20 | 6,000 |

Average annual increase per share for the five-year period:

| None | 220.46 | .478 | 6 |

With regard to these figures there is little dispute. The plaintiff contends that in determining the earnings per share, the bottom figure in columns 7, 9 and 10 should be added. The defendant contends that the bottom figure in column 7 should not be included because this figure does not represent earnings which accrue to the stockholders since the reserve has been provisionally set aside for the policyholders. If we omit the figure in column 7, we find the annual earnings per share amount to $6.48. This figure multiplied by 10 will give us a total value of $64.80 per share for Bankers stock. This figure is obviously out of line. None of the expert witnesses for the defendant contend that the stock should be valued at such a low figure. They take into consideration other elements which bring the value up to at least $160 per share. The fallacy in the computation which we have set out is the failure to give any consideration to the earnings which were provisionally set aside for the deferred dividend policyholders. We feel that a willing purchaser of the corporate stock would consider these earnings for two reasons. First, the reserve is not a fixed liability to the policyholders and may be used for the benefit of the stockholders. Second: the reserve serves to increase the safety factor of the investment. To ignore these earnings would be to ignore value which is manifestly present. However, we do not maintain that they should be considered in toto. If this were done, the value of the stock would be $2,269.38 per share. This seems to the court to be somewhat high, although at least one of the experts was willing to go even higher. A willing purchaser would not consider corporate earnings which had been provisionally set aside for the benefit of policyholders to their full extent in valuing the stock. The evidence shows that in the next few years some of these reserved earnings were actually *paid* to policyholders, and this could reasonably have been anticipated by a willing purchaser. By hindsight we can compute exactly how much was paid from these earnings to policyholders; by foresight a willing purchaser could not. He could only estimate. Again we are put in the position of reconciling the two extreme positions. The plaintiff says consider all of the earnings; the defendant says consider none. We feel that a willing purchaser would consider these earnings only in part. The mean figure between the two extremes would give us a value for the stock of $1,167.09 per share. But to accept this figure the court would have to admit that two completely irreconcilable theories are both correct; consequently, we are doubtful if this method can accurately reflect the value of the stock. Nevertheless, it shall be given some weight in the light of all the other evidence.

## III

## Dividends

If the court had followed the defendant's method of valuation suggested above, we would have been giving a great deal of consideration to the dividend policy of the corporation. It is true that the payment of dividends may be in some cases an important factor in the valuation of corporate stock. See Augustus E. Staley v. Commissioner, 41 B.T.A. 752, 755. It has some weight in this case. But where a conservative policy in respect to dividend payments has been followed, the dividends may become a somewhat unimportant criterion of the value of the stock. 10A Mertens, Law of Federal Income Taxation, Sec. 59.30, cases cited in note 49, p. 61. The witness McLean felt that a purchaser of stock on March 1, 1913, couldn't expect to get any more than $6 a share dividends because that was the policy of the company. The witness felt that because of this policy all the other surplus assets were being accumulated for the benefit of the policyholders. We can not bring ourselves to believe that stockholders, who elect directors, would want to have their surplus earnings accumulated for the benefit of the policyholders. It is true that they received dividends of only $6 per share per year; but this was a closely held corporation, which was just getting a good start, and since most of the stockholders were persons of means, there is no reason why they should desire to withdraw all the accumulated surplus.

In the famous Ford Stock Case, (James Couzens v. Commissioner) 11 B.T.A. 1040, the government argued that the cash dividends of the company did not exceed 40% of its earnings and that a minority stockholder could not control the distribution of dividends and therefore a lower valuation should be put on the stock than would ordinarily be placed on it, considering the corporate earnings. See 11 B.T.A. 1168. The court in that case notes the same thing that we note in this case: "There was neither an unreasonable withholding of profits by the directors nor a prodigal distribution in disregard of the future welfare of the company or the stockholders * * *."

The court, in that case, pointed out that the money left in the company had been earning considerably over 100%. As an analogy, we recognize that the money left in Bankers continued to "snowball" to the date of the taxable exchange with which we are now concerned. In view of the present value of the stock, we are not prepared to say that these reserve earnings had little value to the stockholders in 1913. Nor are we prepared to say that a willing purchaser of the stock would not have by foresight attached some value to these reserve earnings.

For the reasons set forth above, the court has given limited weight to the fact that only 6% dividends were declared prior to 1913, recognizing that a willing purchaser would give this factor some consideration, but that it would not be controlling in view of the other earnings of the corporation.

## Conclusion

In the course of this opinion. the court has discussed, and we hope in a manner which fairly reflects the evidence properly introduced at the trial, the various factors which were persuasive in ascertaining the value of this stock on March 1, 1913. In the light of all the circumstances, this value is very elusive. We call attention to the great differences of opinion which even the experts reached on the point. Mr. Sharp valued the stock at $3,292.99 per share; Mr. Johnson at $2,330; Mr. Best at $1,555.79; Mr. Lounsbury at $1,361.40; Mr. McLean at $170; Mr. Middendorf at $173; and Mr. Dubuar at $160. These valuations run everywhere from $3,292 to $160 per share; consequently, our conclusion in the matter was not easily reached. All in all, we have given consideration to the corporate earning power, the dividend policy, the value of the underlying properties, the capital structure and size of the corporation, its competitive position, the character of its management, and many other factors which a willing and informed purchaser and a willing and informed seller would consider in fixing

a fair price for the stock. Our ultimate conclusion is that the evidence preponderates in favor of a value of at least $1400 per share. The court therefore makes the following special finding of fact:

The stock of Bankers Life of Nebraska had a fair market value on March 1, 1913, of $1400 per share.

The court, in keeping with the stipulation of the parties, shall retain jurisdiction of this action while a recomputation of the taxpayer's liability is made, in accordance with the foregoing findings.