The **SOUTH CAROLINA NATIONAL BANK** and **Julian Mitchell, Jr., Executors of the Estate of Julian Mitchell, Plaintiffs,**

v.

**H. M. McLEOD, Director of Internal Revenue for the District of South Carolina, Defendant.**

Civ. A. No. 8765.

United States District Court
D. South Carolina,
Charleston Division.
July 25, 1966.

Huger Sinkler and Albert Simons, Jr., of Sinkler, Gibbs & Simons, Burnett R. Maybank of Maybank & Manucy, Charleston, S. C., for plaintiffs.

Terrell L. Glenn, U. S. Atty., Columbia, S. C., by Walter J. Tribbey, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

SIMONS, District Judge.

This is an action under Section 7422 of the Internal Revenue Code of 1954

to recover the amount of a deficiency assessment with interest levied by the Director of Internal Revenue and paid by plaintiffs under protest. The jurisdiction of this court is conferred by Title 28, U.S.C., Section 1340, as amended.

Plaintiffs filed with defendant on February 26, 1962 a Federal Estate Tax Return for the Estate of Julian Mitchell, who died testate November 30, 1960, valuing 100 shares of stock of The News and Courier Company of Charleston, South Carolina at $700.00 per share, and 179 shares of The Evening Post Publishing Company also of Charleston at $640.00 per share. Defendant subsequently determined that the fair market value as of the critical date of the News and Courier stock was $980.00 per share, and the Evening Post stock was $980.00 per share.

In accordance with such increased valuation, an additional amount of estate tax and interest was assessed against the Mitchell Estate; and on February 19, 1965 plaintiffs paid defendant under protest the sum of $38,745.38, consisting of a deficiency assessment of $32,878.20, and interest thereon to February 19, 1965 in the amount of $5,867.18. Plaintiffs duly filed a claim for refund of said amount which defendant denied. Plaintiffs thereafter instituted this action for refund of the sum of $38,745.38. The case was tried before the court without a jury in Charleston, South Carolina on March 1, 1966.

■ The issue before the court is the "fair market value" of the stocks in question as of November 30, 1960. "Fair market value" is that price which a willing buyer would pay a willing seller, neither being under compulsion to buy nor sell, and both being fully informed. O'Malley v. Ames, 197 F.2d 256 (8th Cir. 1952); Bader v. United States, 172 F.Supp. 833 (S.D.Ill.1959); Jenkins v. Smith, 21 F.Supp. 251 (D.Conn.1937); Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934).

■ A determination as to value by the Commissioner of Internal Revenue is presumptively correct, and the burden is upon plaintiff to prove by a preponderance of the evidence that the government's evaluation of the stock in question was erroneous. Western Maryland Ry. v. United States, 227 F.2d 576 (4th Cir. 1955). Plaintiffs must also assume the burden of proving a different "fair market value".

■ Although there is evidence before the court of transactions involving the purchase and sale of the News and Courier and Evening Post stocks, the small amounts of stock involved and the infrequency of such transactions require the court to consider all the relevant circumstances connected with the corporations in determining the fair market value of their stocks. See Heiner v. Crosby, 24 F.2d 191 (3rd Cir. 1928). In Snyder's Estate v. United States, 285 F. 2d 857 (4th Cir. 1961), the Court said:

"Closely held corporate stock cannot be valued reasonably by the application of any inflexible formula. One tailored to the particular case must be found, and that can be done only after a discriminating consideration of all information bearing upon an enlightened prediction of the future.

"Financial data is important only to the extent it furnishes a basis for an informed judgment of the future performance of the particular company, for investors buy stock of this kind out of reasoned hope in the future, not out of pride in the past. Specific data may be determinative in one case, but quite immaterial in another. If a corporation is about to go into liquidation, the entire answer may be found in liquidating values, * * *. The use of relevant data must vary with other circumstances. * * *

"A prudent investor, searching for a basis for a reasonable estimate of the future, does not depend upon averages alone. He searches for significant trends, and his use of data that measures past performance must be governed by all of those considerations which enter into managerial projections of sales and earnings."

Confronted with this issue of valuation the District Court in Ames v. O'Malley, 91 F.Supp. 463 (D.Neb.1950), aff'd 197 F.2d 256 (8th Cir. 1952), articulated the same dilemma that confronts this court at pp. 463–464:

"Pinpointing the issue does not in itself solve our difficulties. The valuation of an intangible asset as of a certain date is one of the most complex problems with which courts are forced to deal. * * * We can derive from the substantive law only formal definitions, so broad as to leave the close questions of meaning entangled with inquiries as to the relevance and the weight of evidence. For instance, the present Revenue Code provides that all property, except inventories, shall be appraised at 'fair market value'. 26 U.S.C.A. § 113(a) (1) to (22). The ambiguities of this definition of value become immediately apparent. What is the 'market' value is not always the 'fair' value, and vice versa. In many situations there is no market for the property in question. What test should govern then? The law tells us that fair market value is a question of fact and in determining * * * fair market value of stock in a corporation due regard should be given to the fair market value of the corporate assets on that date. * * * Let us assume that this standard removes all of the confusion as to exactly 'what value' we are searching for. The appraisal of the stock in question is still fraught with difficulty. This is necessarily true because valuations involve economic prophecies based on a complex and highly controversial technique of inferences from the known to the unknown.' "

Nevertheless, likewise obligated by virtue of its authority this court has analyzed the mass of evidence tendered in this case and arrived at the monetary value felt to most closely represent the fair market value of the newspaper stocks on November 30, 1960, the date of the testator's death.[1]

The court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby makes the following finding of fact and conclusions of law.

### FINDINGS OF FACT

1. The News and Courier Company is a South Carolina corporation which had a total of 1,090 shares of Common Stock outstanding on November 30, 1960, and The Evening Post Publishing Company is also a South Carolina corporation with a total of 1,997 shares of Common Stock outstanding on November 30, 1960. As of that date, of the 1,090 shares of News and Courier stock outstanding, a total of 910 shares or 83.30 percent was held by the management of the company and their families and The Evening Post Publishing Company, a corporation controlled by the management of The News and Courier Company. Of the total of 1,997 shares of Evening Post stock outstanding, a total of 1,665 or 83.37 percent was held by the management of the Company and their families on November 30, 1960. The 100 shares of News and Courier stock held by the Estate of Julian Mitchell represented only 9.17 percent of its outstanding stock, and the 179 shares of Evening Post stock held by the Estate represented only 8.96 percent of its outstanding stock. On November 30, 1960 The News and Courier Company had 14 stockholders, including the Mitchell Estate; and The Evening Post Publishing Company had 20 stockholders, including said Estate. Only three of these stockholders, including the Mitchell Estate, were not related to the officers or directors of the Company. Both corporations are closely held, family corporations with very limited and highly restricted market for their stock, if there is any market at all.

1. Sections 2031, 2033 of the Internal Revenue Code of 1954 provide that the value of the gross estate shall include the value of the decedent's property at "the time of his death." See Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S. Ct. 291, 73 L.Ed. 647 (1929).

2. The News and Courier and The Evening Post stocks were not listed on any stock exchange, nor were they traded over the counter. During the period January, 1951 through June, 1965, there have been only ten transactions involving stock sales of both of these companies. A list of these transactions is shown below giving the date, seller, purchaser, and the purchase price:

## STOCK SALES

Evening Post Publishing Company
The News and Courier Company
January 1951 through June 1965

January 1951:
| | |
|---|---|
| 1 share Evening Post Common at | $375.00 |
| 1 share News & Courier Common at | 290.00 |

Sold by: Estate of R. M. Zeigler
76 Rutledge Avenue
Charleston, S. C.
Purchased by: Evening Post and News and Courier

November 1954:
| | |
|---|---|
| 10 shares Evening Post at | $560.00 |

Sold by: Elizabeth E. Parker
c/o Carolina Savings Bank
Charleston, S. C.
Purchased by: Hall T. McGee, Sr.

April 1955:
| | |
|---|---|
| 1 share Evening Post Common at | $560.00 |
| 1 share News & Courier Common at | 670.00 |

Sold by: Evening Post and News and Courier
(from treasury stock)
Purchased by: F. B. Gilbreth
430 Maybank Highway
Charleston, S. C.

August 1956:
| | |
|---|---|
| 1 share News and Courier Common at | $550.00 |

Sold by: Estate of Ethel M. Barry
c/o Irving Trust Company
New York, New York
Purchased by: Hall T. McGee, Sr.

August 1958:
| | |
|---|---|
| 40 shares Evening Post Common at | $625.00 |
| 20 shares Evening Post Preferred at | 55.00 |

Sold by: Estate of Julian E. Cogswell
3 Broad Street
Charleston, S. C.
Purchased by: Edward Manigault and
Hall T. McGee, Sr.

May 1960:

| | | |
|---|---|---|
| 1 share News and Courier Common at | | $750.00 |
| Sold by: | News and Courier (from treasury stock) | |
| Purchased by: | A. M. Wilcox | |
| | 86 Lenwood Blvd. | |
| | Charleston, S. C. | |

March 1963:

| | | |
|---|---|---|
| 2 shares News and Courier Common at | | $700.00 |
| Sold by: | Estate of F. Warrington Dawson | |
| | c/o Morgan Guaranty Trust Co. | |
| | New York, New York | |
| Purchased by: | News and Courier | |

May 1963:

| | | |
|---|---|---|
| 1 share Evening Post Common at | | $640.00 |
| 1 share News and Courier Common at | | 700.00 |
| Sold by: | Evening Post and News and Courier (from treasury stock) | |
| Purchased by: | Carl W. Pollock | |
| | The Crescent | |
| | Charleston, S. C. | |

October 1963:

| | | |
|---|---|---|
| 1 share Evening Post Common at | | $640.00 |
| 1 share News and Courier Common at | | 700.00 |
| Sold by: | Evening Post and News and Courier (from treasury stock) | |
| Purchased by: | R. M. Hitt, Jr. | |
| | 38 Gibbs Street | |
| | Charleston, S. C. | |

June 1965:

| | | |
|---|---|---|
| 1 share Evening Post Common at | | $640.00 |
| 1 share News & Courier Common at | | 700.00 |
| Sold by: | Evening Post and News and Courier (from treasury stock) | |
| Purchased by: | C. B. Williams | |
| | 145 Beaufain Street | |
| | Charleston, S. C. | |

---

All of the above sales by stockholders or their estates were made to either members of the management or to the companies themselves; and all of the sales by the two companies were of qualifying shares to directors of the two companies.

Two arms length transactions closest in point of time to November 30, 1960 were: (1) the sale of forty shares of Evening Post Common Stock by the Cogswell estate to Edward Manigault and Hall T. McGee (officers and directors of the two companies) in August, 1958 for $625 per share; and, (2) the sale of two shares of News and Courier stock by Morgan Guaranty Trust Company as Executor of the Estate of F. Warrington Dawson to The News and Courier Company in March, 1963, for $700 per share. The only sale of either stock which exceeded $700 per share for the News and Courier stock, and $640 per share for

the Evening Post stock was the sale of one qualifying share of News and Courier Common Stock to Arthur Manigault Wilcox in May of 1960 at $750 per share. It is noted that Mr. Wilcox was a member of one of the immediate families of the controlling group, and for this reason the management allegedly made this sale to him at a price higher than that for other qualifying shares to other directors.

3. After Julian Mitchell's death, his corporate executor made extensive efforts to sell his stocks through local investment brokers to no avail. Sales negotiations were conducted with the President of the News and Courier and the Evening Post which culminated in an offer by the two companies to purchase from the Executors the 100 shares of News and Courier stock at $700 per share, and the 179 shares of Evening Post stock at $640 per share. Upon consideration of this offer, the Executors made a counter proposal to sell the News and Courier stock at $800 per share, and the Evening Post stock at $650 per share. Such counter offer was duly rejected, and the newspaper companies held to their original offer of $700 and $640 per share respectively. This evidence was corroborated by Peter Manigault, then and now President of each of the two companies, who testified that their offered price was the maximum that the management of the two companies felt that the stock was reasonably worth.

4. Manigault also testified concerning the two arms length transactions set forth hereinabove which took place in August, 1958, and March 1963 wherein 40 shares of Evening Post stock was purchased from the Cogswell Estate for $625 per share, and two shares of News and Courier stock was purchased for $700 per share. He further testified that the two companies endeavored to provide a fair market for their stock when any stockholder offered his stock for sale to them.

Other subsequent sales of one qualifying share each to three officers and directors were made by each of the two companies between May of 1963 and June of 1965 at a price of $640 per share for the Evening Post stock and $700 per share for the News and Courier stock.

5. Plaintiffs' witness Frost, a prominent securities dealer in Charleston for 39 years with eminent qualifications, testified that there was no market for these stocks, other than the two companies themselves or the management of the two companies. He stated that these stocks had no appeal for an investor because of the low dividends paid, for lack of marketability, and also because such a minority interest would have no voice in management. He further stated that he would not recommend the purchase of these stocks at the price of $700 and $640 per share respectively to any of his customers and that the value placed on the stock by the Executors in the estate tax return was high.

6. Plaintiffs' witness Johnson, also a securities dealer for almost thirty years, fully substantiated the testimony of Mr. Frost.

7. Plaintiffs' expert witness Fox, a Certified Public Accountant and an officer and director of the Augusta, Athens and Savannah newspapers who has had considerable experience in this particular field, testified that, in view of the circulation figures for the News and Courier and the Evening Post as compared to those of the Savannah, Athens and Augusta papers, as well as newspapers throughout the United States, the cost of operation of the Charleston papers from 1956 through 1960, their dividend records, the physical condition of the plant, the needs for improvements and new processes, the percentage of operating profits as compared with other newspapers in the same circulation category, the minority interests of the estate's stock, as well as other factors involved, a reasonable method to determine the "fair market value" of the stock of the two companies as of the critical date is to capitalize the five-year average of dividends at 6%, multiply the average earnings for the five-year period by a price earnings factor of 10, take 50% of the book value, add the results obtained, and divide by three. His firm opinion

was that the "fair market value" of the News and Courier stock was $632 per share and that of the Evening Post stock was $478 per share, as of November 30, 1960. His calculation for the Evening Post stock took into consideration the increase in its book value by reason of its ownership of 785 shares of the stock of the News and Courier. It is noted that his valuation figures of $632 and $478 per share respectively were substantially lower than those used by plaintiffs in the Estate Tax Return.

8. Plaintiffs' expert witness, P. T. Hines, was a past president of the Greensboro, North Carolina News who had previously appraised three newspapers in this area and who had had extensive experience in newspaper appraisal work. He testified that he has been familiar with both of the Charleston newspapers since about the year 1930, and considered them both very fine newspapers. In his opinion subject shares should be valued as follows:

### NEWS AND COURIER

5-year average of per share dividends, $18, capitalized at 4% $ 450.00
75% of book value ................................... 834.90

$1284.90

Arithmetical average (1284.90 ÷ 2) ...................... $ 642.45
Value per share, News and Courier ...................... 642.45

### EVENING POST

5-year average of per share dividends, $11, capitalized at 4% $275.00
75% of book value ................................... 732.00

$1007.00

Arithmetical average (1007 ÷ 2) ........................ $ 503.50
Value per share, Evening Post .......................... 503.50

He further testified that the equipment of the company was obsolete, and he reflected this in his computation of value, by reducing the book value used by 25 percent. It should be noted, however, that under the witness' "averaging" method of computation, a shareholder's interest increased in per-share value only by $75.75, despite the fact that under the witness' own testimony the Evening Post had enjoyed appreciation in the value of its 785 shares of News and Courier stock of $402,680 (785 shares times $642, less cost of $101,295).

9. The defendant's only witness, John Alden Grimes, has had substantial newspaper appraisal experience since 1935, most if not all as an employee of the Internal Revenue Service. He testified that the most important data in a newspaper appraisal is recent comparable sales of other newspaper stocks and/or businesses. He further testified that once such sales are located, there are various capitalization rates or yardsticks used by the investing public to measure such sales. Certain of the more common yardsticks used are the price-earnings ratio (sales price divided by latest year's earnings); the dividend yield (sales price per share divided by the dividends paid per share); unit price per subscriber (the sales price divided by the total number of newspaper subscribers); and a cash-flow analysis. Mr. Grimes indicated that he considered each of these different measurements, with the exception of the cash-flow method, in making the instant appraisal, and concluded that in this case the price-earnings ratio was the more reliable yardstick of value.

10. While Mr. Grimes stated that there were a number of newspaper sales during 1959 and 1960, he considered certain of these transactions more indicative of the value of the stocks in question than others. Based upon his judgment, he presented the following list of newspapers sold during 1959 and 1960:

### 1959

| | Price-Earnings Ratio |
|---|---|
| Ambridge Citizen, Pennsylvania | (operated at a loss) |
| Charlotte News, North Carolina | 21.58 |
| Chicago Daily News, Illinois | 27.59 |
| Fairmont Corporation, Montana | 30.0 |
| Middleton Press, Connecticut | 21.7 |
| New Britain Herald, Connecticut | 11.98 |
| Schenectady Union-Star, New York | 30.3 |

### 1960

| | |
|---|---|
| Denver Post, Colorado | 20.25 |
| Dubuque Telegraph-Herald, Iowa | 17.48 |
| Savannah News and Press, Georgia | 27.00 (Approx.) |
| Springfield Union, News and Republican, Massachusetts | 22.19 |
| Pensacola News-Journal, Florida | 14.00 |
| Lynn News, Massachusetts | (heavy loss) |
| Nyack Journal News, New York | 16.67 |
| San Gabriel Valley Tribune, California | 33.61 |
| Boston Herald-Traveler, Massachusetts | 13.48 |
| Cincinnati Enquirer, Ohio | 9.16 |

The Boston Herald-Traveler and Cincinnati Enquirer were the only two publicly held companies, and the other sales were primarily single transactions. It is also noted that under this data there was no material distinction in the price earnings ratio for majority or minority sales which indication has therefore been omitted above.

11. On the question of the difference in value between a majority and a minority shareholder's stock interest, Mr. Grimes testified that on the basis of his study in 1957 a minority shareholder's interest was subject to some discount; and that on the average, the discount would not exceed 35 percent of the value received for a majority shareholder's interest. Mr. Grimes likewise stated that based upon this prior study and the data he had studied for sales occurring during 1959 and 1960, a discount of no more than 35 percent would be properly applicable to the Evening Post and News and Courier stocks owned by the decedent.

Mr. Grimes further stated that the Dow-Jones public stock quotations represented a maximum ceiling on the price-earnings ratio at which newspaper stocks are commonly sold. According to his testimony and that of the plaintiffs' witness Fox, the price-earnings ratio for the Dow-Jones stocks for the year 1960 was approximately 18 times earnings. Using the Dow-Jones quotations as the ceiling, and the results of his study and analysis of the 1959 and 1960 sales outlined above, Mr. Grimes concluded that a price-earnings multiple of 16 would result in a conservative estimate of the market value of the Evening Post and News and Courier stocks.

12. The following in summary form was Mr. Grimes' final computation of value for the stocks in question:

| | News & Courier | Evening Post |
|---|---|---|
| Income from newspaper operation after adjustments for inter-company dividends | $ 131,822 | $ 106,666 |
| Price-earnings multiple | 16 | 16 |
| | 790,932 | 639,996 |
| | 1,318,220 | 1,066,660 |
| | $2,109,152 | $1,706,656 |
| Adjustments for long term debts and preferred stocks | ........ | –56,000 |
| | $2,109,152 | $1,650,656 |
| Adjustment for value of News & Courier stock (785 x $1935) | ........ | +1,518,975 |
| Value of 100% ownership | $2,109,152 | $3,169,631 |
| Per share value | $ 1,935 | $ 1,587 |
| Less 35% discount | (677) | (555) |
| | 1,258 | 1,032 |
| Final value | $ 1,250 | $ 1,025 |

———◆———

## DISCUSSION

### I

*Evaluation of Assets, The Market, and Competition*

None of the witnesses attempted to determine the fair market value of the stock solely on a valuation of the assets underlying the stock. Nevertheless, many of the decisions deal with an evaluation of assets; see, for example, Meredith Pub. Co. v. C. I. R., 64 F.2d 890 (8 Cir. 1933) for the analysis of the circulation structure of a publishing company as an "asset". The Commissioner recognizes the evaluation of the entire enterprise *inter alia* in Rev.Rul. 59–60, § 4 (1959).[2]

2. The following factors are listed as fundamental, requiring careful analysis in each case:
 "(a) The nature of the business and the history of the enterprise from its inception.
 "(b) The economic outlook in general and the condition and outlook of the specific industry in particular.
 "(c) The book value of the stock and the financial condition of the business.
 "(d) The earnings capacity of the company.
 "(e) The dividend-paying capacity.
 "(f) Whether or not the enterprise has goodwill or other intangible value.
 "(g) Sales of the stock and the size of the block of stock to be valued.
 "(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter."

During the years under consideration, 1956 through 1960, straight book value of the Companies appeared as follows:

## THE NEWS AND COURIER COMPANY

| | 12/31/56 | 12/31/57 | 12/31/58 | 12/31/59 | 12/31/60 |
|---|---|---|---|---|---|
| Net Worth ..$ | 978,775 | $1,052,773 | $1,125,050 | $1,253,688 | $1,360,891 |
| Common Shares ..... | 1,089 | 1,089 | 1,089 | 1,089 | 1,090 |
| Value per share (Calculated book value).$ | 761.26 | $831.29 | $ 897.66 | $ 1,015.78 | $ 1,113.20 |

## EVENING POST PUBLISHING COMPANY

| | 12/31/56 | 12/31/57 | 12/31/58 | 12/31/59 | 12/31/60 |
|---|---|---|---|---|---|
| Net Worth[3] .$ | 1,616,751 | $1,689,044 | $1,737,074 | $1,855,319 | $1,949,342 |
| Common Shares ..... | 1,997 | 1,997 | 1,997 | 1,997 | 1,997 |
| Value per share (Calculated book value).$ | 809.00 | $ 845.00 | $ 869.00 | $ 929.00 | $ 976.00 |

A material segment of these assets reflects the value of the manufacturing plant, a joint facility used by both the News and Courier and Evening Post. The plant when constructed in 1952 contained four Hoe type press units and additional units were added in 1954 and 1959. This was the plant occupied by both companies on November 30, 1960, and although only eight years old at the time, their management recognized the need for improvement, and planned the construction of a new plant. There was also testimony indicating that the typesetting equipment in use at that time was obsolete, a fact which should further depreciate the stated book value of both companies.

██ Plaintiffs' expert witness Fox considered fifty percent of the book value and plaintiffs' witness Hines considered seventy-five percent in their calculations. The defendant's expert Grimes merely testified that he had examined and studied the assets of the companies and considered this factor when determining the price-earnings multiple. No inflexible assignment of a percentage of book value to a particular capitalization formula without reason appears to be satisfactory. Nevertheless, all of the expert witnesses from experience and training recognized the basic importance of the valuation of assets. The Fourth Circuit in *Snyder's Estate,* supra, would indicate that a valuation of assets as the sole test might be appropriate only if the corporation is liquidating. As the sole test it was rejected in Estate of Thomas W. Tebb, 27 T.C. 671 (1957). If then book value alone cannot be determinative of "fair market value", what part should it play? Reflecting upon this approach, it would seem that, although a newspaper business is the manufacturer and distributor of a product, it is service oriented. It calculates a market to be served. A newspaper must predict at its peril the receivability of that service; or perhaps mind-

3. This figure has been adjusted to represent the exclusion of the value of preferred stock. It must also be noted that the book value of 785 shares of News and Courier stock owned by the Evening Post is carried at $101,295, the purchase price.

ful of it, it may proceed in disregard of a segment of public opinion to capture a majority of the market. Like the size of newsboy's paper bag and means of transportation, the assets of a newspaper measure its current size and posture. The less calculable factors such as present and prospective ascertainment of the market, present and prospective competition, and efficiency in operation determine to a great extent its actual cash value. Accordingly, the court would proceed relying upon calculated net worth as a base with these considerations in mind.

The market of the newspapers includes the coastal region of South Carolina radiating from Charleston. Whatever national circulation the newspapers enjoy, and there was testimony indicating that the News and Courier has some share in this market, appears to be negligible as affecting total sales or improving advertising.

On November 30, 1960, there were two television and five radio stations operating in the Metropolitan Area of Charleston, which were in general competition with each other, as well as with the News and Courier and the Evening Post, in the presentation of news and for advertising. In addition, there was competition in the circulation area of the two Charleston papers from the Savannah and Columbia papers, as well as competition from suburban weeklies.

As a result of this competition the total lineage figure for 1960 was below that for 1956, and the general advertising lineage of both newspapers showed a constant annual decline from 1956 through 1960. Nevertheless, the income sources showed the following steady increases:

### THE NEWS AND COURIER COMPANY

| Gross Revenue | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|
| Advertising Revenue .... | $1,456,773 | $1,462,952 | $1,411,235 | $1,664,047 | $1,726,833 |
| Circulation Revenue .... | 763,302 | 814,613 | 887,617 | 902,877 | 918,897 |
| Net Other Revenue ........ | (25,822) | (13,392) | (5,405) | (7,298) | (26,429) |
| Net Total Revenue [4] ....... | $2,194,253 | $2,264,274 | $2,293,448 | $2,559.626 | $2,619,300 |

### THE EVENING POST PUBLISHING COMPANY

| Gross Revenue | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|
| Advertising Revenue .... | $1,238,580 | $1,247,011 | $1,216,270 | $1,458,135 | $1,537,485 |
| Circulation Revenue ....... | 289,378 | 300,439 | 309,961 | 320,360 | 329,653 |
| Misc., Less Discounts, etc. .. | (24,079) | (14,005) | (5,240) | (8,407) | (24,250) |
| Total Revenue [4] | $1,503,879 | $1,533,444 | $1,520,290 | $1,770,088 | $1,841,888 |

On November 30, 1960, therefore, the prospective for these newspaper businesses was uncertain: a defined market; dependency upon increased population to purchase one product; and inroads from other advertising media. Nevertheless, the court is mindful of the monopolistic position of the two newspapers within their unique market positions.

4. These figures were submitted on stipulation by the two parties. Upon examining these figures the court has noted several mathematical errors. For example, for the News and Courier in 1957 there is a $101 error; for the Evening Post in 1958 a $701 error.

## II

*Earnings Capacity of The Stock, Dividends Actually Paid, The Minority Position*

The net earnings and earnings per share of the two companies for the years 1956 through 1960 are as follows:

### NEWS AND COURIER

| Year | Net Earnings (After Taxes) | Earnings Per Share |
|---|---|---|
| 1960 | $131,822 | $120.94 |
| 1959 | 149,675 | 137.32 |
| 1958 | 89,701 | 82.29 |
| 1957 | 91,423 | 83.87 |
| 1956 | 104,331 | 95.72 |
| Average for five-year period | 113,390 | 104.03 |

### EVENING POST

| Year | Net Earnings (After Taxes) | Earnings Per Share |
|---|---|---|
| 1960 | $124,093 | $ 62.14 |
| 1959 | 143,212 | 71.71 |
| 1958 | 71,000 | 35.55 |
| 1957 | 92,861 | 46.50 |
| 1956 | 111,080 | 55.62 |
| Average for five-year period | 108,449 | 54.30 |

An examination of the profit and loss statements reflects the following income after taxes and dividends actually paid on the two Companies which were low, i. e., approximately twenty percent in 1960 for the News and Courier and approximately the same for the Evening Post.

### THE NEWS AND COURIER COMPANY

| Year or Period Ended | 12/31/56 | 12/31/57 | 12/31/58 | 12/31/59 | 12/31/60 |
|---|---|---|---|---|---|
| Commercial Income after taxes | $104,331 | $91,423 | $89,701 | $149,675 | $131,822 |
| Dividends Paid | 17,424 | 17,424 | 17,424 | 19,602 | 26,154 |
| Per Share | 16 | 16 | 16 | 18 | 24 |

### EVENING POST PUBLISHING COMPANY

| Calendar Year | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|
| Commercial Income after taxes | $111,080 | $92,861 | $71,000 | $143,212 | $124,093 |
| Dividends paid—Preferred | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Dividends paid—Common | 19,970 | 19,970 | 19,970 | 21,967 | 27,985 |
| Common per share | 10 | 10 | 10 | 11 | 14 |

Section 4(e) of the Commissioner's Revenue Ruling in 59.60 provides in part:

"Primary consideration should be given to the dividend-paying capacity of the Company rather than the dividends actually paid in the past. Recognition must be given to the necessity of retaining a reasonable portion of the profits in a Company to meet competition. * * * *Where an actual or effective controlling interest in a corporation is to be valued, the dividend factor is not a material element,* since payment of such dividend is discretionary with the controlling stockholders." (Emphasis added).

A corollary to this conclusion by the Commissioner is that *the dividend factor is a material element in the valuation of a minority stockholder's interest.* Other courts have recognized that the payment of dividends in some cases may be a primary factor in the valuation of corporate stock. See Augustus E. Staley v. Commissioner, 41 B.T.A. 752 (1940). For the News and Courier and Evening Post the record of dividends paid is poor for the earnings record, and in November of 1960 the prospect for an increase in dividends was not outstanding. Although lower dividends in relation to earnings are a major disadvantage of the minority stocks, there are others. For example, in 1960 compensation to the officers of the News and Courier Company amounted to $111,025.00, while salaries and wages paid were $274,917.00, and for the Evening Post Company $111,-025.00 to officers and $195,152.00 for salaries and wages paid. Although small, it is also noted that the corporations made political contributions out of earnings, an activity which is usually beyond the pecuniary interest of the investing public. Capitalizations computed on these earnings per share and dividends per share as presented by the expert witnesses are discussed in paragraphs 7–12, supra, and as follows:

## III

### Capitalization Ratios

The three valuation methods employed by the parties in this action indicate the underlying controversy. Plaintiffs assert tests that are calculated to emphasize the minority status of the stocks. Defendant recognizes this factor but refuses any substantial importance to it. It becomes therefore a primary issue in this valuation.

 Let us first consider the price-earnings ratio test. The test simply amounts to determining the earnings per share and multiplying by a given factor. The factor itself is open to great controversy. By examining a number of past newspaper sales and other data defendant has determined the multiple from those earnings and sales figures. In the statistics presented by defendant the twenty corporate newspaper sales submitted for comparative purposes show a variance in the multiple of 9.16 to 30. In the multiple of the two publicly held corporations, The Boston Herald Traveler and The Cincinnati Inquirer, the price earnings ratios were 13.48 and 9.16, respectively. Of the stock sales involving solely minority interests the price-earnings ratio averaged somewhat above 20 times. Defendant's expert witness Grimes then concluded that taking into consideration the operations of the Evening Post and the News and Courier the value of the two newspapers could best be determined by using a multiple of 16 times the earnings. In regard to similar testimony in Estate of Eugene H. Kelly, 247 T.C. 1168 (reported at 55–129PH, Memo T.C. 1955–129), the Tax Court said:

"This witness based his fundamental calculation on a price earnings ratio which he evolved from analysis of the national data relating to a number of corporations primarily engaged in the publishing business. From a theoretical standpoint, there is much to be said for the general approach of this witness, but it is quite apparent that his basic premises were not sound because the publishing companies whose data were used in his calculations were in no real sense comparable to taxpayer, and there was no satisfactory effort to make practical adjustments which

would render a comparison helpful. The value of the ratio adopted by the witness falls with the want of comparability. *Moreover, the witness gave little regard to the special circumstances faced by petitioner with repect to evaluation of a minority interest in a closely held corporation the stock of which the market was very restricted.* (Emphasis added.)

The court agrees with defendant that the price-earnings ratio capitalization would be highly reliable if properly tied to comparable newspaper sales. The price-earnings ratio, however, should be first examined as relating to that particular industry. If the industry is similar or comparable in size, market, product and competition, or a *relevant* number of these, the Commissioner's test would need no indorsement for it would seem obvious that the price-earnings ratio would attract the investing public. See Sill Corp. v. United States, 343 F.2d 411 (10th Cir. 1965). In the newspaper industry, although the product has common attributes, its market is predictable but variable in each instance from the quality and quantity of competition. The monopoly position of the News and Courier and Evening Post in circulation of that product is geographical. Nevertheless, they face stiff competition from other sources. Is their position comparable to a large metropolitan newspaper of different size, direct newspaper competition, other revenue sources and public ownership? Comparative circulation and income sources, if presented, would have also been a major tying factor. The very irrelevance of the conclusiveness of the price-earnings ratio test or at least the multiples urged upon the court is shown by the restricted markets for this stock. If the companies were comparable, there should be some indication that investors are attracted by the investment potential shown in the difference. This is not to say that the price-earnings ratio should not be a relevant factor in determining the valuation of newspaper stock, but until such other evidence is shown that ties in these average multiples with other comparable newspaper stocks this court should not rely solely on the figures presented by the government. It would seem in this instance that instead of the investing public relying on these particular earnings multiples "as the highest and best evidence of the capitalization rate" to determine whether or not to invest in this stock, the earnings multiples recited merely reflects some of the variable circumstances that the investing public does consider. Nevertheless, the court does rely on the earnings ratio and the multiple considered has been between 9.16 and 13.48 established by the publicly held companies which is in accord with the testimony of the other experts.

Although the court does not acknowledge *in toto* the calculations of plaintiff's expert witness Hines, his recognition of dividends in his calculations supports the court's conclusion that this factor has great relevance, particularly in measuring a minority interest. For this reason what consideration the court has given to the price-earnings computation must be discounted by this factor. Hines' averaging of dividends, however, is open to the same criticism leveled by the Fourth Circuit in *Snyder's Estate;* an investor does not depend upon averages. Fox's calculations give equation to earnings, dividends and assets. This yardstick provides a perspective, but in the court's view unnecessarily depreciates the quality of revenue. The court has hereinbefore discussed the percentage assignment of assets reflected in Hines' and Fox's testimony. In the same manner all formulae are open to some criticism, nevertheless they are all relevant and the court has considered them as closely as discussed in arriving at its valuation. In the final analysis a determination by the court of fair market value is a matter of judgment and opinion rather than mathematics based primarily upon a given factual situation. The matter of fixing the value of corporate stock, with numerous factors involved, cannot be accomplished with exactness or complete accuracy. The court must exercise sound discretion and good

judgment within the framework of proper legal standards. Arc Realty Co. v. C. I. R., 295 F.2d 98 (8th Cir. 1961). Each case must be considered on its own merits and factual situation, with the final decision being hardly more than an "educated estimate".

## IV

### Summary

Careful consideration has been given all the evidence presented, including the opinions and reasoning of the expert witnesses, and stipulations of fact. The court has attempted to analyze, accept and coordinate those parts of the testimony which it has determined helpful and has made its own analysis of the data relating to earnings, dividends, and book value. The family control of the two newspapers and its actual and potential effect on the declaration of dividends has been given considerable weight, as well as the fact that the stock involved in this action is unlisted and untraded, and represents a minority interest in a closely held corporation, where the possibility of a minority stockholder ever acquiring control, or having any voice in management of the Companies, is highly improbable, if not practically impossible. Weight has also been given to the fact that a ready market for such minority interest is very limited, if not in fact nonexistent. Although the sales of this stock in arms length transactions preceding and following November 30, 1960 consisted of only two such transactions which merely involved forty shares of Evening Post stock and two shares of News and Courier stock, consideration has also been given to these transactions as shedding some light on the fair market value of this stock on the critical date. Consideration has also particularly been given to the relative high earnings and low dividends, a double edged sword. The court has considered the history of the corporations, information as to advertising and circulation, competitive factors, including the competition of radio and television as well as other media, and has likewise reviewed the geographical extent of the activities of the two companies, as well as the factors of obsolescence, the requirements for replacement and new processes, and the rapid technological changes taking place in the newspaper industry.

## CONCLUSIONS OF LAW

The court has jurisdiction of the parties and the subject matter of this action.

The sole issue for determination by the court is the "fair market value" as of November 30, 1960 of 100 shares of The News and Courier stock and 179 shares of the Evening Post stock which was owned by the decedent, Julian Mitchell, at the time of his death on that date.

The "fair market value" again is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both being fully informed of all of the relevant facts and circumstances. The court has given consideration to the many factors herein involved which it considers that a willing and informed purchaser and a willing and informed seller would take into consideration in arriving at a fair price for the corporate stocks involved.

It is the considered judgment and opinion of the court that the preponderance of the evidence establishes that the "fair market value" of the 100 shares of The News and Courier stock and the 179 shares of Evening Post stock as of November 30, 1960 did not exceed the per share price of $800 and $700 respectively, and the court so finds and concludes.

The court retains jurisdiction of this action in order that a recomputation of plaintiff's tax liability may be made by defendant in accordance with the foregoing findings and conclusions, and in order that a proper judgment may be entered herein. The defendant is hereby ordered to proceed to determine and advise the court without delay the amount of the tax refund and interest to which plaintiffs are entitled.

And it is so ordered.